UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JOHN DOE,<br>　　　　　PLAINTIFF | Civil Case No. _____ |
| vs. | |
| UNIVERSITY OF CONNECTIUCT<br>AND BRIAN GOEPFRICH,<br>　　　　　DEFENDANTS. | DATE: January 20, 2020 |

**COMPLAINT AND JURY DEMAND**

### I.  INTRODUCTION

1.      John Doe sues Defendants University of Connecticut and Brian Goepfrich under 42 U.S.C. § 1983 for the violation of his due process rights under the Fifth and Fourteenth Amendments to the United States Constitution, under 20 U.S.C. 1681, et seq. ("Title IX"), and under common-law theories of breach of contract.  He requests emergency relief ordering his immediate reinstatement to his rightful place in the UConn class of 2020.

2.      John Doe is an African-American student at the University of Connecticut.  In the fall of 2019, John Doe was one semester from completing his degree in Management Information Systems in the UConn Business School with a 3.5 GPA.  He never had any disciplinary problems, neither in high school nor in college.  He has never been arrested.  He was certainly never accused of "sexual assault" -- until the false allegations raised against him at issue in this complaint.

3.      UConn pre-judged John Doe as guilty in a biased investigation and effectively threw him out of school on October 15, 2019 -- **before** even completing its investigation into the allegations against him.  October 15, 2019 was the day that Defendant Student Conduct Officer Brian Goepfrich interviewed John Doe in the first stages of UConn's investigation.  But UConn presumed John Doe guilty before looking at all the evidence.  On the day of his initial interview,

UConn placed an immediate hold on his transcript and blocked his enrollment in the spring 2020 semester.

4.     UConn violated John Doe's constitutional rights, and its own policies guaranteeing due process, by denying him notice of the charges against him and by denying him a meaningful opportunity to be heard.  UConn placed the burden on John Doe to prove his innocence, forbade him from presenting exculpatory evidence and witnesses on his behalf, blocked his cross examination of witnesses against him, and indulged in a biased process calculated to "support the [presumed] victim" rather than determine the truth.

5.     UConn found John Doe "responsible," the campus-court equivalent of "guilty," despite his accuser Jane Roe's admission that they had consensual sex.  She initiated sexual contact with John Doe during the incident and invited him to her bedroom.  In UConn's rush to judgment, the university ignored its own policies in clear breach of contract.  UConn excluded statements John Doe submitted from witnesses, contrary to express policy.  UConn refused to provide John Doe with the written allegations that Jane Roe submitted against him, also contrary to express policy.  UConn further breached its policies by failing to provide a fair and equitable process.  This forced John Doe to defend himself with one hand tied behind his back.

## II.   PARTIES

6.     John Doe is a student of Defendant University of Connecticut.  He is a resident of Maryland.

7.     Defendant Brian Goepfrich ("Goepfrich") is an employee of the University of Connecticut and resides in Connecticut.

8.     Defendant University of Connecticut ("UConn") is the flagship university of the Connecticut State College and University System ("CSCU").  The University of Connecticut is a recipient of federal funding, and its principal place of business is Storrs, Connecticut.

### III.   JURISDICTION AND VENUE

9.      This Court has jurisdiction under 28 U.S.C. § 1331 and under 28 U.S.C. § 1367(a) because Plaintiff's cause of action arises under Title IX, 20 U.S.C. 1681, *et seq* and 42 U.S.C. § 1983, laws of the United States.  This Court has supplemental jurisdiction over all state-law claims under 28 U.S.C. § 1367(b).

10.     This Court also has diversity jurisdiction under 28 U.S.C. § 1332(a) because John Doe is a resident of Maryland whereas all Defendants reside in Connecticut.  The amount in controversy exceeds $75,000.

11.     Venue is proper in this Court under 28 U.S.C. § 1391(b) because Defendants reside within the jurisdiction of this Court and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred at Defendants' campus in Storrs, Connecticut within the jurisdiction of this Court.

### IV.   FACTS

#### A.  Jane Roe Initiates Sexual Activity with John Doe and Invites John Doe to her Bedroom

12.     John Doe is an exemplary member of the UConn student body.  Until his unfair two-year suspension, he worked in the African American Cultural Center ("AACC"), maintained a 3.5 GPA, and was one semester away from graduating with a major in Management Information Systems in the UConn business school.

13.     John Doe was born in the United States to first-generation immigrants from Jamaica.  Both his mother and father came to this country seeking to take advantage of America's first-rate system of higher education, economic opportunity, and a fair and equitable justice system.  They also sought to secure these opportunities for their children, including John Doe, who enrolled in UConn in the fall 2016.

3

14.     John Doe has never been in any trouble.  He had no disciplinary issues in high school, and no disciplinary issues in college until he was falsely accused of "rape" by Jane Roe. John Doe has never even been arrested, not once.

15.     On the evening of April 5, 2019, John Doe attended an off-campus party with his roommate FW and with two friends, KW and JM, who are students of another university.  Before leaving for the party at approximately 10:00 pm, John Doe and FW shared some Captain Morgan Long Island Iced Tea.  John Doe had only three shots during this pre-party.  This drink is not as strong as hard liquor.  It has only 17% alcohol content.  This was the only alcohol that John Doe consumed that evening.

16.     Jane Roe and her close friend JT later claimed that, hours later, John Doe was so drunk he was "unbalanced … he would lean on the counter"; "falling over"; "needed help standing"; "stumbling"; "could not hold himself up"; and "not standing straight up."  (*See* Affidavit of John Doe in Support of Emergency Motion for Temporary Restraining Order and Preliminary Injunction ("Doe Aff.," filed under seal), **Exhibit B**,[1] at JD00024-25, 45, 52.)  No one else at the party confirmed this.

17.     In fact, undisputed testimony showed that John Doe did not drink at the party, including the testimony of Jane Roe's friend JT.  His accuser's characterization of his intoxication was false.

18.     This was the first of Jane Roe's blatant misrepresentations about John Doe.  Jane Roe and her friend JT purported to have seen John Doe in a state of drunkenness that would stand out to anyone at the party, the kind of behavior no one could miss or mistake.

---

[1] All exhibits refer to the exhibits attached to the Doe Aff.

4

19.     Yet multiple witnesses provided or were prepared to provide testimony that John Doe was not "falling down drunk" and that the young women were not truthful.  This evidence of Jane Roe's lack of credibility was excluded.

20.     At an eventual hearing, in which John Doe was deprived of any meaningful opportunity to present his defense, UConn's Student Conduct Officer and Title IX Investigator Brian Goepfrich dismissed this untruthfulness of Jane Roe as a mere "subjective" impression.  This was demonstrable bias.  Goepfrich and UConn's biased Hearing Board consistently excluded John Doe's witnesses and evidence concerning Jane Roe's misrepresentations.

21.     Is undisputed that, at the party, Jane Roe and her friend JT initiated contact with John Doe and his friend JM.  As the party wound down around 1:00 in the morning, Jane Roe and JT approached John Doe and JM from the kitchen of the house.  JT showed interest in JM.  Jane Roe showed her interest in John Doe.  FW and KW were more or less ignored.

22.     The six students, JM, KW, FW, JT, Jane Roe, and John Doe, left the party in JM's car.  JM's car is a full-sized sedan, a Nissan Altima.  JM drove everyone to Blaze Pizza to get something to eat.  Piling into the backseat were FW, JT, Jane Roe, and John Doe.  KW sat in the passenger seat.  The full-size Nissan Altima sedan had room for all four students who sat in the back seat to squeeze in side-by-side.  Yet Jane Roe climbed into John Doe's lap.  John Doe did not ask her to sit in his lap, much less force her.  She did so by choice.

23.     During the ride to the pizzeria, Jane Roe began to lap dance, moving rhythmically and "grinding" on John Doe's penis.  She later denied doing so, but her active role in starting sexual activity was confirmed by KW and FW.  Goepfrich and UConn's hearing panel excluded this evidence as well.  KW, sitting in the front passenger seat, felt Jane Roe's knees pressing rhythmically against the seat back and understood this to be sexual activity: "I could also feel the

knees of the girl sitting on [John Doe's] lap through the back of my seat.  I could feel that she

was moving back and forth.  It was clear to me that these movements on [John Doe's] lap were

sexual.  She was not just bumping my seat randomly."  (*See* Doe Aff., **Exhibit N**, ¶ 5.)

24.     FW also saw Jane Roe lap dancing to the music in a sexual rhythm: "While we

were driving to Blaze, the girl sitting on [John Doe's] lap was moving like she was dancing on

his lap, moving her body like moving from her waist.  I didn't want to stare at them."  (Doe Aff.,

**Exhibit F**.)

25.     John Doe reciprocated by reaching around and "fingering" Jane Roe's vagina.

Jane Roe admitted that this was consensual.

26.     When Goepfrich issued his decision finding John Doe responsible, he refused to

include any evidence demonstrating Jane Roe's sexual agency.  (Doe Aff., **Exhibit D**

(Goepfrich's "Judgment").)  Jane Roe consistently misrepresented her active participation in and

initiation of any activity that evening.  Goepfrich assisted by removing evidence from his

Judgment of Jane Roe's active and willing participation in sexual activity.  This included

rejecting FW's witness statement and refusing to interview KW.

27.     After everyone piled out of the car and got pizza, they all returned to the car.  The

activity that had begun on the way to the pizzeria began again.  Jane Roe again began moving

her body rhythmically against John Doe's penis.

28.     JM next drove to Nathan Hale Inn, some rooms of which UConn uses to house

students.  FW and John Doe shared a dormitory room at Nathan Hale.  FW got out on the

driver's side, and John Doe got out on the passenger side.  John Doe still intended to go home to

bed, alone.  But Jane Roe and JT called out to him to get back in the car, join them, and come

back to their dormitory, called West.

29.     John Doe rejoined Jane Roe only because she invited him to her dorm room.  Jane Roe admitted this much to her roommate the next morning, "When they got back from the party it was like two go to this room [JT's] and the other two go to the other room [Jane Roe's].  This was not blatantly stated but a mutual agreement after all coming back to the dorm."  (Doe Aff., **Exhibit B** at 44.)

30.     Contrary to Jane Roe's changing story after the fact, however, this invitation was blatantly stated.  Both JM and KW witnessed Jane Roe plead with John Doe to return to her dormitory with her.  Goepfrich excluded this too from his Judgment, erasing Jane Roe's active participation and initiation of the encounter.

31.     JM stated: "… both [women] were saying things to [John Doe] like, let's hang out, come over to our place. …  I'm sure that both women wanted [John Doe] to get back in and were saying these things together.  I am sure that [Jane Roe] was participating in this…"  (Doe Aff., **Exhibit F**.)

32.     KW witnessed the same thing.  When John Doe got out, "both girls in the backseat called out to him to pull him back into the car.  They wanted him to come back to their place. …  It was clear that one was interested in [JM] and the other was interested in [John Doe]."  (Doe Aff**., Exhibit N**, ¶ 7.)

33.     JM parked his car near the young women's West dormitory.  JM and John Doe followed, and Jane Roe let them in.

34.     Months later, as Jane Roe began to accuse John Doe of "rape" to UConn's Title IX administrators, she claimed that she had intended to invite everyone to her room to watch Netflix and have a sort of pizza party.  She said, "I made it a point that we can all, as a group,

watch TV in my room as a way to infer that I had no intentions of doing anything sexual." (Doe Aff.**, Exhibit B** at 16.)

35.     This was preposterous on its face. Once again, Jane Roe misrepresented her active role in inviting John Doe to her room for sexual activity. It is contradicted by objective fact: JT and Jane Roe abandoned KW, who remained in the car and was never invited to do anything "as a group." As he said, "there was zero interaction with me. I sure wasn't being invited back to their dorm. I was the 'fifth wheel' but I didn't care. … When they left the car, the girl's led [JM] and [John Doe] to their building. No one invited me to do anything." (Doe Aff.**, Exhibit N, ¶¶** 7, 9.)

36.     Once in the dormitory, JM and JT went to JT's room. John Doe and Jane Roe went to Jane Roe's room. This was just what Jane Roe told her roommate the next morning: there was a mutual agreement that "two go to this room and the other two go to the other room." (Doe Aff.**, Exhibit B** at 44.) Later, to erase her active role in the evening's events, Jane Roe claimed that she never wanted to be alone with John Doe. Because neither JT nor Jane Roe's roommate were available at the hearing or otherwise, John Doe was prevented from questioning them, even though both were witnesses to this and many other of Jane Roe's misrepresentations.

**B. Consensual Sex in Jane Roe's Dorm Room**

37.     When they were alone in Jane Roe's room, after approximately 15 minutes, Jane Roe asked John Doe to sit down on her bed. What Jane Roe had begun in the car started up again. She lifted her legs and put them over John Doe's lap. John Doe reciprocated by rubbing her legs. John Doe had his back to the wall across the bed toward the foot of the bed.

38.     John Doe started to pull down Jane Roe's pants. She initiated the next step by asking, "Do you have a condom?" (Doe Aff.**, Exhibit B** at 29.) John Doe got up and took off his pants, from which he retrieved a condom. When he turned back to the bed after putting on

the condom, Jane Roe had voluntarily removed her own underwear.  This and her request for a condom, John Doe told Goepfrich in an investigative interview, "showed her consent. It was *unambiguous*" (emph. added).  (Doe Aff**., Exhibit B** at 43.)

39.     When John Doe explained these events to Goepfrich, however, Goepfrich wrote "*ambiguous*" in his interview transcript.  (Id.)  This fact speaks volumes about Goepfrich's bias. He apparently comprehends it as ambiguous that a woman would directly ask a man to get a condom and then take off her own underwear as the man puts the condom on.  To Goepfrich, even the clearest indication of consent does not indicate consent so long as a female student expresses regret after the fact.

40.     Jane Roe and John Doe proceeded to consensual sexual intercourse, which lasted approximately 15 minutes, spending about 5 minutes in each of three different positions.  In the second position, Jane Roe got on top of John Doe, and she guided his penis into her vagina.  She then switched to supporting herself on all fours with John Doe behind her.  She was an active, willing participant in their sexual activity, or as she admitted the next morning, "cooperative." (Doe Aff**., Exhibit B** at 44).

41.     After they were done, John Doe recalled that Jane Roe "left the bedroom to clean herself.  This did not occur prior to sex."  (Doe Aff**., Exhibit B** at 41.)  Their sex concluded approximately 30 minutes after John Doe and Jane Roe were alone in her room.

42.     In Jane Roe's story of these same events, however, she continued to contradict herself.  She took pains to conceal her own sexual agency, however contradictory her efforts might be to do so.  She presented herself as a passive victim.  Jane Roe claimed that she "froze." (Doe Aff**., Exhibit B** at 15.)  However, she also admitted that "At first I was on my back.  Then … I was sitting on top of him facing him."  (Id. at 22.)  She told her friend the next morning that

she was also "cooperative." (Id. at 44.) She had no explanation for how she could "freeze" but still maintain an active, cooperative position on top of John Doe. Goepfrich never asked.

43.     Jane Roe claimed that this was "rape" because she allegedly made up "excuses" and said "no" and "stop." (Doe Aff.**, Exhibit B**, Text Messages at 16-17.) John Doe insisted that not only had she never indicated "no"; instead, she had initiated sex by asking for a condom and removing her underwear, among other actions and words.

44.     That night, when Jane Roe rejoined JT, both JM and John Doe overheard the women giggling and having a good time as they left. Jane Roe admits that she did not tell JT that she had been "raped." Later, she claimed this was because she was "shocked," which, of course, Goepfrich credited. (Doe Aff.**, Exhibit B** at 15.) During his so-called investigation, Goepfrich did not credit a single male witness and only excluded the witnesses of John Doe.

45.     But at most, the evidence strongly suggests that Jane Roe regretted sex after the fact.

**C. Jane Roe Asks JT's Permission to Have Sex with John Doe**

46.     The reason for Jane Roe's regret arose that evening with her friend JT. JT had previously expressed interest in John Doe. Just days before the April 5 party (on March 31, 2019), JT had asked Jane Roe to text message John Doe, which she did: "one of my friends [JT] wanted to fwy [fuck with you] but they wanted to know if you fw anyone before shooting their shot." (Doe Aff.**, Exhibit B**, Text Messages at 34.) Jane Roe declined to disclose these text messages to UConn during its investigation.

47.     On the night of the party, April 5/6, 2019, Jane Roe soon realized that her consensual sex with John Doe would compromise her friendship with JT, even though JT was down the hall having a consensual sexual encounter with JM.

48.     JT remembered that Jane Roe came to her door "maybe 10-15 minutes" after the couple separated, but she did not express certainty about the time.  (Doe Aff., **Exhibit B** at 24.)

49.     What is clear is that, once at her door, Jane Roe asked JT's permission to have sex with John Doe:

> We talked outside of the room.  She was like [John Doe] wants to have sex.  She knew I had [a] crush on him.  I told her no you could not.  She said okay and she went back to her room.…  From my knowledge I did not know that anything occurred.…  He is trying to have sex with me.  And I was like no.  And she said okay fine.  ***She was asking me for permission.***

(Doe Aff., **Exhibit B** at 25 (emphasis added).)

50.     JM, who was in JT's room, could not hear what the two women discussed at the door.  But he recalled that this happened right before he and JT began their own physical intimacy.  He recalled they had sexual intercourse in the latter half of the hour that the couples spent alone with each other.  This placed Jane Roe's visit to JT's door roughly 30 minutes after the couples had split up, not 10-15 minutes.

51.     The timing is crucial because it places Jane Roe's request for permission after she had already had consensual sex with John Doe.  And John Doe's undisputed testimony placed their consensual sexual intercourse in the first half hour of their time in the dormitory.

52.     Jane Roe later claimed that she left the room multiple times to "avoid" having sex with John Doe.  Crucially, she claimed to have abandoned John Doe and left him alone in her room prior to sex.  Months later, Jane Roe complained that she had fled her room because she feared being sexually assaulted and, she claimed, John Doe "wouldn't listen to me and was still very drunk."  (Doe Aff., **Exhibit B** at 15.)

53.     Yet JT never expressed any disquiet about her friend Jane Roe to JM.  There was not a single sign of alarm.  There was no sign she was concerned that her friend might be

11

sexually assaulted.  JT's account confirmed this, in which she said she "did not know that anything occurred."  (Doe Aff.**, Exhibit B**, at 25.)

54.     Jane Roe also later denied asking JT's "permission."  (**Exhibit B** at 53.) Obviously, that would indicate her own sexual desire and that she sought sex with John Doe, which she took pains to misrepresent at every step.

55.     Yet her own account of seeking permission at her friend's door was entirely consistent with JT's:

> I left my room and walked to my friends [sic.] room to tell her that he was trying to have sex with me.  She responded and simply said "no", given she at one point liked him.

(Doe Aff.**, Exhibit B** at 15.)  Jane Roe then added:

> I then returned to my room where [John Doe] still was and grabbed some shorts and went to the bathroom so I could change before getting in my bed.

(*Id*.)  This was not about the threat of sexual assault.  It was about the threat that JT was still interested in John Doe because she had "at one point liked him."  (*Id*.)

56.     Putting aside Jane Roe's multiple misrepresentations and inconsistencies, her account requires one to believe that she fled her bedroom to shun aggressive sexual advances, disclosed her predicament to her friend JT -- who received not the slightest indication that anything was actually wrong -- then slipped into even less clothing in order to return directly to John Doe and slip into bed to be "raped."

57.     Had the preponderance of the evidence standard been properly applied, the evidence tells a much simpler story:  After John Doe and Jane Roe had consensual sexual intercourse, she left the room to clean up (as John Doe said) and visited her friend.  She discovered that her friend strongly disapproved of her having sex with John Doe.  She was then

faced with an impossible situation: she had betrayed her good friend's trust.  Permission retroactively denied turned instantly into regret after the fact.

58.     From that moment on, Jane Roe sought to erase her active role in the evening, changing her story as she went.

**D. John Doe's Contracts with UConn as Embodied in UConn Policies**

59.     UConn has promulgated various policies that constitute contracts with its students upon their matriculation and payment of tuition.

60.     Among the contracts that UConn has formed with its students is the University of Connecticut Policy against Discrimination, Harassment, and Related Interpersonal Violence. (**Exhibit O** ("Title IX Policy").)

61.     UConn has promised its students, including John Doe, that it "does not unlawfully discriminate in any of its education or employment programs and activities on the basis of individuals' race, color, ethnicity, religious creed, age, sex, marital status, national origin, ancestry, sexual orientation, genetic information, physical or mental disability … or membership in any other protected classes at set forth in state or federal law."  *Id*. at 4.

62.     UConn promises that its Title IX policy prohibits specific forms of behavior that violate, among other laws, Title IX of the Education Amendments of 1972 ("Title IX") and the Violence against Women Reauthorization Act of 2013 ("VAWA"), as well as related state and federal antidiscrimination laws.  *Id*.  UConn's compliance with these laws includes, but is not limited to, their implementing regulations.

63.     UConn has promulgated its Title IX Policy to fulfill its obligations under Title IX as well as its reporting obligations under the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act (the "Clery Act") and its implementing regulations.  *Id.*

64.     The Title IX policy defines "Sexual Assault" as follows:

**Sexual Assault** consists of (1) Sexual Contact and/or (2) Sexual Intercourse that occurs without (3) Consent.

1. Sexual Contact (or attempts to commit) is the intentional touching of another person's intimate body parts, clothed or unclothed, if that intentional touching can reasonably be construed as having the intent or purpose of obtaining sexual arousal or gratification.

2. Sexual Intercourse (or attempts to commit) is any penetration, however slight, of a bodily orifice with any object(s) or body part. Sexual Intercourse includes vaginal or anal penetration by a penis, object, tongue or finger, or any contact between the mouth of one person and the genitalia of another person.

3. Consent is an understandable exchange of affirmative words or actions, which indicate a willingness to participate in mutually agreed upon sexual activity. Consent must be informed, freely and actively given. It is the responsibility of the initiator to obtain clear and affirmative responses at each stage of sexual involvement. Consent to one form of sexual activity does not imply consent to other forms of sexual activity. The lack of a negative response is not consent. An individual who is incapacitated by alcohol and/or other drugs both voluntarily or involuntarily consumed may not give consent. Past consent of sexual activity does not imply ongoing future consent.

Consent cannot be given if any of the following are present: A. Force, B. Coercion or C. Incapacitation.

A. Force is the use of physical violence and/or imposing on someone physically to gain sexual access. Force also includes threats, intimidation (implied threats) and/or coercion that overcome resistance.

B. Coercion is unreasonable pressure for sexual activity. Coercion is more than an effort to persuade, entice, or attract another person to have sex. Conduct does not constitute coercion unless it wrongfully impairs an individual's freedom of will to choose whether to participate in the sexual activity.

C. Incapacitation is a state where an individual cannot make rational, reasonable decisions due to the debilitating use of alcohol and/or other drugs, sleep, unconsciousness, or because of a disability that prevents the individual from having the capacity to give consent. Intoxication is not incapacitation and a person is not incapacitated merely because the person has been drinking or using drugs. Incapacitation due to alcohol and/or drug consumption results from ingestion that is more severe than impairment, being under the influence, drunkenness, or intoxication. The question of incapacitation will be determined on a case-by-case basis. Being intoxicated or incapacitated by drugs, alcohol, or other medication will not be a defense to any violation of this Policy.

*Id*. at § IX.D.

65.     According to UConn's Title IX Policy and its definition of "sexual assault," Jane Roe was the initiator of sexual activity, for example, when she began "grinding" against John Doe's penis or asking him to get a condom.

66.     UConn has also promulgated a Student Code of Conduct, called The University of Connecticut Responsibilities of Community Life: The Student Code ("Student Code").  (Doe Aff**., Exhibit E.)**

67.     Part III of the Student Code sets forth additional rules of student conduct.  It also establishes procedures for adjudicating complaints of sexual misconduct.

68.     Among the additional rules the Student Code imposes are "**Endangering behavior**, which includes, but is not limited to, conduct that threatens or endangers the health or safety of any person including one's self."  (Id. at Part III.B.5.)

69.     UConn has established a single investigator model, a method of adjudication which has been universally condemned, even by victims' advocacy organizations and organizations that promote "risk management" for university administrations, such as the Association of Title IX Administrators (ATIXA).[2]  UConn sets up a single college administrator, in John Doe's case, Defendant Goepfrich, as detective, prosecutor, judge, and jury over accused students.  Accused students are afforded no right to meaningfully question witnesses, no safeguards against the arbitrary exclusion of exculpatory evidence, no meaningful hearing, and no meaningful right of appeal the single investigator's judgment.

70.     Following UConn's single investigator model, the Student Conduct Officer, here Defendant Goepfrich, passes judgment without any hearing or other opportunity for

---

[2] ATIXA, Comment, Docket ID No. ED 2018-ED-0064, Proposed Regulations Implementing Title IX of the Education Amendments of 1972, 34 CFR Part 106 at 32 avail. at https://cdn.atixa.org/website-media/o_atixa/wp-content/uploads/2012/01/18120231/ATIXA-NPRM-Comments-FInal.pdf.

confrontation of witnesses or evidence.  UConn then offers the accused student a Hobson's

choice.  He may either submit to the judgment of the investigator or ask for an extremely limited

appeal before an administrative Hearing Body.  Student Code, Part IV.

71.     This Administrative Hearing is not meaningful.  UConn limits its scope of review

to

i.    whether the investigation was conducted in a fair, impartial, and reliable manner;

ii.   the information is sufficient to support the factual findings;

iii.  and there is a rational basis, applying a preponderance of the evidence standard for the recommended findings regarding a potential violation of The Student Code.

(Student Code, Part IV.D.3.j.)  By this standard, the Hearing Board sits to affirm the single

investigator's judgment on any possible ground.  Especially in a he-said/she-said scenario, this

makes it impossible to appeal the single investigator's judgment.  A student will never be able to

show that a decision of the sole Student Conduct Officer—whose supposed fairness is reviewed

only by his peer administrators with a conflict of interest and who are not independent—has *no*

sufficient evidence or is wholly *irrational*.  (*See* Student Code, Part IV.D.)

72.     After the Hearing Board affirms the single investigator's judgment, the accused

has one final appeal to an ill-defined "next level of student conduct authority."  (Student Code,

Part IV.F.)

73.     While the student's first appeal is strictly limited to a showing of bias, insufficient

evidence, and the irrationality of the Student Conduct Officer, the final level appeal is even more

limited.  The accused can challenge only whether the administrative hearing (*not* the original

investigation or judgment) was conducted in conformity with UConn's procedures; whether the

accused student was given "a reasonable opportunity to prepare and present information" at the

16

hearing; whether the sanctions were appropriate; and whether there are "information and/or facts

… not known to the person appealing at the time of the original ministry of hearing."  (Id.)

74.     At no level may the accused student appeal to an independent decision-maker

outside the so-called "Community Standards" bureaucracy of UConn for an objective review of

the evidence.  And there is no independent decision maker who does not have a vested interest in

protecting the administrative office of "Community Standards."

### E. Goepfrich Invents his Own Rules in the Biased Investigation Amidst Public and Private Pressure to "Believe the Woman"

75.     In text messages Jane Roe sent to John Doe six days after their sexual encounter,

Jane Roe suddenly bombarded John Doe with accusations.  (**Exhibit B**, Text Messages at 34-37.)

76.     She alleged that she had said "no and to stop before and during sex."  (Id.)  John

Doe immediately disputed these allegations as untrue.  He nevertheless remained respectful of

Jane Roe: "I'm so sorry Omfg  No way you actually said that  Because I would've known  And

you told me to put on a condom  I'm so confused."  (Id. at 35.)

77.     Jane Roe was already raising the first of many obvious misrepresentations.  She

claimed that she had made many "excuses" not to have sex, "One of which was you not having a

condom."  (Id.)  But it cannot be disputed that John Doe had a condom, and Jane Roe admits that

the couple practiced safe sex.  Jane Roe also claimed, "I NEVER said for you to come to west

[dormitory]"—which multiple witnesses confirmed to be false. (Id. at 36.)  This also

contradicted what Jane Roe had admitted to her roommate the next morning.  Jane Roe told her

roommate that there was a mutual agreement: "[w]hen they got back from the party, it was like

two go to this room and the other two go to the other room … after all coming back to the dorm."

(**Exhibit B** at 44.)

78.     On April 16, 2019, Jane Roe made a written allegation to Dr. Wilena Price, UConn's Director of the African American Cultural Center ("AACC").  (**Exhibit B** at 13.)

79.     UConn's policies provide that "[t]he respondent [i.e. the accused, John Doe] will be notified of the allegation."  (**Exhibit P, "**Respondent Policy," Definitions, Respondent.) UConn also defines "Allegations" as the report "file[d] … concerning alleged misconduct of any student … in writing, [submitted] by the ***individual reporting the conduct*** …"  (Student Code, § IV(A).)  UConn never produced a copy of Jane Roe's original Allegation to John Doe.  The existence of Jane Roe's first statement only became apparent much later, during the Administrative Hearing (held December 16, 2019).  But then, UConn's Hearing Board simply accepted Jane Roe's representation that it was more or less the "same" that she submitted months later.

80.     Back in April, however, Jane Roe did not pursue a complaint against John Doe. She never reported any incident to the police, nor did she seek a restraining order, she did not ask UConn for interim measures of any kind, such as a campus no contact order or adjustments in their common work schedules at the AACC.

81.     UConn took no action in response to her first report.  John Doe and Jane Roe continued to work at the AACC together despite the allegation, and they did so without incident. There is absolutely no evidence that Jane Roe's education suffered in any way.

82.     Jane Roe only changed her mind after returning from summer vacation 2019.

83.     At that time, there was swelling student activism and public pressure on UConn to increase prosecutions of male students on campus in order to combat perceived "sexual violence."  Just as John Doe and Jane Roe entered UConn as freshmen, Connecticut news station Fox61 ran the lurid headline, "UConn ranks first in national report about campus rapes."  See

FOX61, June 7, 2016, avail. at https://fox61.com/2016/06/07/uconn-ranks-first-in-national-report-about-campus-rapes/.

84.     In 2018, UConn students also rallied in support of Christine Blasey Ford and against the Brett Kavanaugh nomination.  See e.g., https://www.wtnh.com/news/education/uconn-students-rally-in-support-of-christine-blasey-ford-against-kavanaugh-nomination/.  The mantra was, "people are to be believed when they have experiences of sexual assault," as well as "Believe Survivors."  UConn has fostered an atmosphere in which it is a political imperative to believe female students' accusations of sexual assault independent of facts that may or may not support those accusations.

85.     At the time that Jane Roe first made a report to the university in April 2019, UConn held its "Sexual Assault Awareness Month," followed by a "Take Back the Night Rally," in which students marched with banners proclaiming "believe the woman," "support survivors," and "end victim blaming."  See Courtney Gavitt, Sexual Assault Awareness Month: UConn Fights the Violence and You Can Too, The Daily Campus, April 8, 2019, avail. at https://dailycampus.com/stories/2019/4/8/sexual-assault-awareness-month-uconn-fights-the-stigma-and-you-can-too.

86.     These are annual events on UConn's Storrs campus, which the administration, including its Title IX Office, has encouraged, supported, and supplied with resources.  See also Hollianne Loa, The March and 'Me Too': Both Are the Start of a Movement, The Daily Campus, October 22, 2018, avail. at https://dailycampus.com/stories/tag/March+to+End+Victim+Blaming; Annual Take Back the Night Rally sponsored by UConn Women's Center, avail. at https://womenscenter.uconn.edu/2019/04/09/take-back-the-night/

87.     UConn has not promoted a Title IX Policy calculated to "believe the evidence." Instead, as announced in opposition to proposed reform regulations promulgated by the Office for Civil Rights ("OCR") by attorney Elizabeth Conklin, UConn's Associate Vice President, Office of Institutional Equity ("Title IX Office"), UConn's Title IX Policy and Title IX Office is dedicated to "support victims and survivors" with a "trauma-informed approach." *See* https://today.uconn.edu/2017/09/uconn-statement-potential-federal-overhaul-title-ix/.  Rather than "believe the evidence," this approach presumes what is supposed to be proved.

88.     The "trauma-informed" approach (which the Obama-era OCR imposed on colleges and universities across the United States) is demonstrably biased in favor of female accused students.  (*See Doe v. Syracuse Univ.*, No. 5:18-CV-377, 2019 U.S. Dist. LEXIS 77580, at *37 (N.D.N.Y. May 8, 2019) (case to proceed on showing that goal of 'trauma-informed investigation and adjudication processes … according to the U.S. Department of Education's Office of Civil Rights … is to ensure 'the protection of girls and women'").)  It has led to a spike in false convictions where it has been adopted as official policy.  *See e.g.* Reggie Yager, What's Missing from Sexual Assault Prevention and Response, Dec. 3, 2015, *avail. at* https://papers.ssrn.com/sol3/papers.cfm?abstract_id=2697788.

89.     Amid activism on campus, Jane Roe renewed her complaint on or around September 12, 2019.  She then submitted a new statement composed months after her first Allegations.  (**Exhibit B** at 16.)  Unsurprisingly, it differed significantly from the only other contemporaneous report ever provided to John Doe, a statement Jane Roe divulged to her roommate the day after the party on April 6, 2019.  (**Exhibit B** at 44-45.)  On information and belief, this second Allegation also differs from Jane Roe's first Allegation, which UConn still withholds from John Doe.

90.     Upon Jane Roe's second complaint, UConn's Title IX bureaucracy swung into action.  Goepfrich contacted John Doe on September 20, 2019 by sending a letter suggesting a violation of "The Student Code."  Goepfrich notified John Doe that he was being accused of an alleged incident of "non-consensual sexual contact and nonconsensual sexual intercourse" but no other charge.  These charges do not exist in UConn's policy, which only defines the charge of "sexual assault."  UConn provided no notice whatsoever of the charge of "endangering behavior."

91.     Contrary to UConn's Title IX Policy and Title IX itself, Goepfrich refused to provide John Doe with a copy of Jane Roe's Allegations -- either the April Allegations or the September Allegations.  The former has never been provided.

92.     This immediately prejudiced John Doe.  John Doe had no knowledge that Jane Roe claimed to have fled her bedroom prior to their consensual sex.  He had no way to know that the timeline of events in the bedroom would be so crucially important.

93.     In addition, had John Doe known of the charge of "endangering behavior," he could have developed evidence that Jane Roe had experienced no interruption of her education or campus affairs as a student.  From the start, UConn ensured that John Doe had to defend himself with one hand tied behind his back -- in violation of its own policies and in violation of his due process rights.

94.     Because UConn initiated its investigation against John Doe only in mid-September 2019, important evidence had already disappeared.  UConn acknowledges this will happen where complaints are neglected.  (See Title IX Policy, § VII(B): "the University's ability to respond may diminish over time, as evidence may erode, memories may fade…").  This

included campus video footage and records of key swipes in and out of Jane Roe's dormitory, which would have shown her later denial that she led John Doe to her dorm room to be false.

94. Tellingly, Goepfrich acknowledged that John Doe's "information has been consistent through his written statement and interview statement." (Decision at 11.) Goepfrich gave no reason to disbelieve John Doe's consistent account of events.

96. By email 10 days after the investigation began (September 30, 2019), Goepfrich asked John Doe for a "written statement by Friday, October 4, 2019 at 4:00 PM," still without any indication of the specific charges and without providing the Allegations -- in violation of John Doe's due process rights and UConn's express policy.

97. John Doe asked for any statements or evidence being used against him. Goepfrich refused. This violated Title IX. (See 2017 Q&A, Answer 6, "responding parties … must have timely and equal access to any information that will be used during informal and formal disciplinary meetings and hearings"). It was also another violation of UConn's Title IX Policy, through which UConn purports to comply with the Clery Act, Title IX, and implementing regulations. These include, among others, 34 C.F.R. § 668.46(k)(3)(i)(B)(3) (compliant policy shall "[p]rovide[] timely and equal access to the … accused … any information that will be used during informal and formal disciplinary meetings and hearings").

98. Goepfrich called John Doe to an interview on October 15, 2019 in his office. It was on this day that Goepfrich wrote in his transcript of the interview that a woman who asks for a condom and then takes off her own underwear is giving an ***ambiguous*** sign of consent.

99. On the day Goepfrich interviewed John Doe (October 15, 2019), John Doe was already prejudged "guilty" and effectively thrown out of school. UConn locked down his transcript, which he could no longer access, and barred him from registering for the Spring 2020

Semester.  (**Exhibit G**.)  No policy of UConn provides for this presumptive expulsion of the accused.

100.     To prepare his defense, John Doe submitted statements from JM and FW.  They attested, among other things, to Jane Roe's consistent, affirmative, and active role in their sexual contact that evening.  This included her initiation of sexual contact in the car as well as her invitation to come to the dormitory.

101.     UConn's Student Code expressly allowed John Doe to do so.  The policy states that the "respondent … may … provide witness statements and any documentation that may be relevant to the facts of the incident."  (Student Code, Part IV.B.2.)

102.     In violation of UConn's policies, Goepfrich refused these statements.  Goepfrich insisted that he could only consider witnesses if the witnesses individually contacted him independently and submitted to his interview.  Nowhere in UConn's Student Code or Title IX Policy is this required.

103.     This prejudiced John Doe.  In interviews, Goepfrich "cleaned" the exculpatory evidence from the record, for example, by not asking FW if the contact between Jane Roe and John Doe he had witnessed in the car was sexual in nature.  He did not ask JM about the timing of his sexual encounter with JT and the disputed appearance at her door of Jane Roe.

104.     This also placed the burden of proof unfairly on John Doe.  He had to gather the evidence and provide it to Geopfrich, not vice versa; he had to gather his friends and witnesses and have them contact Goepfrich.  Even then, when he submitted their statements, Goepfrich rejected them in violation of UConn's express policy.  Even when he provided the name of KW, Geopfrich declared KW "not pertinent" to the investigation.  This was contrary to the Student

Code, in which the investigator must "make a reasonable effort" to identify information.  (Id., Part IV.B.2.)

105.    It was no longer UConn that bore the burden of proving a student "responsible." This burden shifted to John Doe to prove his innocence.  (*Compare* 2017 Q&A, Answer 7 ("In every investigation conducted under the school's grievance procedures, the burden is on the school—not on the parties—to gather sufficient evidence to reach a fair, impartial determination as to whether sexual misconduct has occurred.")

106.    Among other things, Goepfrich's unfair burden shifting resulted in throwing out FW's statements that Jane Roe was "sitting on John Doe's lap … moving like she was dancing on his lap, moving her body like moving from her waist.  I didn't want to stare at them."  (FW Statement.)  Goepfrich removed this information and cleaned the evidence to be consistent with Jane Roe's assertion that she was sexually passive at all times.  (*Compare* Judgment at 6: "FW … located in the back of the seat, did not provide information regarding Jane Roe grinding on John Doe or describe any sexual activity in the backseat of the vehicle.")

107.    This also enabled Goepfrich to exclude any evidence provided by KW from his judgment.  In violation of Title IX and UConn's policies, Goepfrich refused to interview KW. KW confirmed Jane Roe's sexual contact in the car, confirmed her solicitation of John Doe to return to her room when he exited to Nathan Hale Inn, confirmed that Jane Roe never invited everyone "as a group" to some sort of TV and pizza party in her room, and confirmed that John Doe was not "falling down" drunk.  (2017 Q&A, Answer 6 ("equitable investigation of a Title IX complaint requires a trained investigator to analyze and document the available evidence to support reliable decisions, objectively evaluate the credibility of parties and witnesses,

24

synthesize all available evidence—including both inculpatory and exculpatory evidence—and take into account the unique and complex circumstances of each case")).

108.     John Doe was given no chance to question a single witness in this crucial stage of UConn's process that resulted in the Judgment against him.  He did not even learn of the complete Allegations against him until Goepfrich submitted his Judgment.  John Doe received the Judgment by email/letter on November 14, 2019.  (**Exhibit D**.)

109.     In his Judgment, Goepfrich endorsed Jane Roe's story completely, ignoring her many misrepresentations and inconsistencies.  (**Exhibit D** at 12.)  He found John Doe "responsible" (the campus-court equivalent of "guilty" in a criminal trial) for "sexual assault." (Id.)  But then Goepfrich went even further and added a guilty charge for "endangering behavior."  (Id.)

110.     Goepfrich's Judgment condemned John Doe to permanent expulsion and the termination of his education -- an expulsion that the Title IX Office had, for practical purposes, already put into effect on October 15, 2019 by freezing John Doe's transcript and barring him from registration in the spring semester.

111.     Goepfrich's Judgment tacked on the accusation of "endangering behavior" (Rule No. 5).  Yet no one made complaints "endangerment," nor was John Doe ever notified of this charge until after the investigation was complete.  Goepfrich never provided John Doe with the Complaint or Allegations against him for any such change.  The "endangering behavior" charge was an escalation initiated solely by Goepfrich, another indication that, throughout this process, he acted as a zealous prosecutor rather than as an unbiased fact finder.

112.     If left to stand, Goepfrich's decision would block John Doe's education at any future school to which he applies.  It places an added burden on a young black man from an

25

immigrant family, with no prior disciplinary issues and no criminal background.  It was the
academic equivalent of a death sentence.

### F.  UConn Deprives John Doe of a Meaningful Hearing

113.    But Goepfrich's chicanery did not end with the Judgment sent to John Doe on
November 14, 2019.

114.    In the Judgment, Goepfrich requested that John Doe "email me within *four
business days* (5:00 PM, Tuesday, November 19, 2019, November 19, 2019 [sic.]) to inform me
of the resolution process you would like this case to be resolved by way of."  (**Exhibit D** at 1)

115.    Goepfrich showed his unfairness by counting business days incorrectly and
shortening the amount of time for John Doe to respond.  Four business days from November 14,
2019 fell on November 20, 2019.  Yet when John Doe asked for the full four days, Goepfrich
arbitrarily denied him the additional day.  When asked to clarify what rule of counting time or
policy Goepfrich relied upon, Goepfrich merely insisted that John Doe respond one day early.
(**Exhibit C**.)

116.    UConn offered John Doe the option of admitting responsibility and acquiescing to
his unfair expulsion.  But John Doe could not agree to terminate his education.  He had no choice
but to request the unconstitutionally limited review of Goepfrich's Judgment at an administrative
hearing offered under UConn's Title IX Policy.

117.    UConn first scheduled a Hearing Board to convene on December 4, 2019, the
Monday after Thanksgiving break.  Goepfrich directed John Doe to submit a list of witnesses, a
summary of their expected testimony, and any statement or additional evidence he wishes to
present by 9:00 a.m. December 2, 2019.

118.    Because the deadline fell at 9:00 a.m. on the Monday morning after Thanksgiving
break, this was prejudicial in the extreme.  John Doe had to round up all his witnesses and

compose his statement during a time in which it is almost impossible to reach anyone on a college campus due to the holiday.

119.    John Doe asked that the Hearing Board be postponed for this reason.  He received no response until *after* the 9:00 a.m December 2, 2019 deadline, when he had already rushed to submit his materials.  Only then did the Hearing Board respond.  John Doe was granted an extension of the hearing until December 16, 2019.  (Doe Aff.**, Exhibit J**.)

120.    But even more unfair than being whipsawed by UConn's Title IX bureaucracy, the Title IX Policy did not provide for a meaningful hearing or a meaningful appeal of Goepfrich's Judgment.  There are only three grounds for the Hearing Board's review: 1) whether the investigation was "conducted in a fair, impartial, and reliable manner"; 2) whether "the information is sufficient to support the factual findings"; and 3) whether "there is a *rational basis*..."  (Student Code, Part IV.D.3.j.)

121.    The UConn Hearing Board does not weigh the evidence independently or other hallmarks of fair evidentiary hearings.  It was constrained to affirm the Goepfrich Judgment unless John Doe could prove Goepfrich's bias (to other Title IX officials already committed by UConn policy to "support the [presumptive] survivor," and who had a clear conflict of interest), prove Goepfrich's irrationality, or prove the lack of any sufficient evidence.  In a he-said/she-said case, John Doe could not win.

122.    The UConn Hearing Board does not sit to weigh the evidence independently, but merely to confirm Goepfrich's prosecutorial Judgment on any possible ground.

123.    The hearing took place on December 16, 2019.  Five witnesses came to testify in support of John Doe about the following:

a) Witness 1 and Witness 2: prepared to testify that John Doe was not "falling down" drunk at the party of April 5, 2019 demonstrating Jane Roe's lack of credibility.

b) KW: whom Goepfrich had excluded, prepared to testify that he had witnessed Jane Roe's sexual movements in the car as well as her solicitation of John Doe to come to her dorm.

c) FW: whose statement Goepfrich had excluded, prepared to testify that he had witnessed Jane Roe's sexual movements in the car as well as her solicitation of John Doe to come to her dorm, evidence that Goepfrich had excluded from his judgment.

d) JM: whose statement Goepfrich had excluded, prepared to testify that he had witnessed Jane Roe solicit John Doe to come to her dorm and to give a timeline of Jane Roe's apparent visit to JT's dorm room door.

124. The Hearing Board was composed of administrators Alisa Geller and John Armstrong. Just as Goepfrich before them, they refused to hear John Doe's witnesses. They excluded all except JM. John Doe also gave a statement to the Hearing Board, which proceeded to question him aggressively, especially about whether he had affirmative consent to touch Jane Roe in the car – where the evidence (all of it excluded) indicated she had initiated the sexual activity. The panel did not question Jane Roe.

125. John Doe objected that Witness 1 and Witness 2 from the party could provide evidence that Jane Roe consistently misrepresented the truth by portraying him as falling-down drunk. Goepfrich, who attended the hearing, countered that Jane Roe's obvious misrepresentation that John Doe was "falling down" drunk was merely a "subjective impression." It was not subject to refutation. John Doe objected, but Hearing Officer John Armstrong retorted that UConn's campus court was not a court of law and objections did not apply.

126.    Jane Roe attended the hearing, and John Doe was permitted to submit questions to her through the Hearing Board.  However, none of the witnesses who had supported Jane Roe's allegations were required to attend.  They were placed beyond questioning.

127.    Questioning did reveal that Jane Roe had submitted an Allegation (i.e. a written statement) to Dr. Wilena Price in the April timeframe which had never been provided to John Doe.  When John Doe's counsel asked for the statement, the hearing officer barked that advisors were not allowed to speak.  John Doe also asked for the statement.  Goepfrich could not account for it.  When Jane Roe stated, without any evidence, that it was the "same," the Hearing Board simply chose to believe her.  No further inquiry was made.  To this day, John Doe has still not received Jane Roe's original Allegation, which also violates UConn's Title IX Policy.

128.    Predictably, considering John Doe's judgment had been preordained since October 15, 2019, the Hearing Board affirmed Goepfrich's Judgment.  John Doe was informed immediately after the hearing that he had to remove himself from campus.  The Hearing Board instructed him, at approximately 6:00 p.m. on the night of December 16, 2019, after almost all students had left campus for Christmas break, that he could no longer even return to his dormitory to collect his belongings.

129.    Reputational harm was immediate.  Jane Roe began texting his friends across campus that he was a "rapist."  She and her friends began a campaign to "cancel" anyone associated with him.  A fellow student texted friends calling him a "sexual predator."  (**Exhibit K**.)

130.    John Doe's friends received word, "i can't respect sexual predators or anybody who knowingly associates with them. … you and the rest of y'all niggas should have beat his

29

ass.  he needs his ass beat…"  (Id.)  John Doe has not only suffered reputational harm; he is now threatened with real violence and racial epithets.

131.    John Doe submitted a second appeal within five business days, as UConn's Title IX Policy allows.  On December 31, 2019, UConn sent John Doe notice that his appeal had been received.  But UConn does not provide accused students with any stay of sanctions pending appeal.  And John Doe had already been effectively thrown out of spring semester since October 15, 2019 -- the day of his interview with Goepfrich -- when UConn placed a hold on his transcript and blocked his further enrollment.  The Spring 2020 Semester begins on January 21, 2020.

132.    On January 15, 2020, Eleanor JB Daugherty, Associate VP for Student Affairs and Dean of Students sent John Doe his second-level appeal decision.  (**Exhibit L**.)  She gave no written justification, and the decision did not address the procedural irregularities of the Hearing Board, among them the mysterious April Allegations which are still withheld from John Doe.

133.    Dean Daugherty did, however, commute John Doe's expulsion into a two-year suspension extending until January 1, 2022.  Yet this remains an expulsion in all but name.  John Doe is still subject to UConn's arbitrary administrative decisions.  He must reapply for admission.  Dean Daugherty emphasized, "Readmission to the University is not guaranteed."  *Id.* In addition, John Doe must apply for re-acceptance to the business school, even if he is permitted to return to UConn.  His reinstatement is also not guaranteed to the business school.  In a measure that can only be characterized as punitive, John Doe may not earn any transfer credits in the interim: UConn "will not accept credits earned at another institution during [his two-year] of suspension."  *Id*.

134.   UConn has also permanently evicted John Doe from University housing, which applies even after his return.  *Id.*

135.   There are additional conditions.  He must meet with a Community Standards Officer, drawn from the ranks of the likes of Goepfrich, who serves as gatekeeper to his readmission.  The Community Standards Officer holds sway over whether John Doe may be recommended for readmission and can set as-yet-unnamed preconditions for return.  Even as UConn commutes John Doe's academic death sentence of expulsion, it has raised multiple barriers to return.  UConn forbids him to continue his education at other institutions for transfer credit, and effectively blocks his transfer to another university by denoting the disciplinary sanction in his transcript.  UConn's two-year suspension stops his education in its tracks.

136.   John Doe was one semester away from graduating.  UConn's actions have preempted his search for internships and post-university employment.  It makes transfer to another university impossible, and brands him a "sexual predator."

137.   In addition to the emotional toll this has taken on John Doe, he will suffer the consequences of diminished income and career opportunities extending into the indefinite future.

## V.   CAUSES OF ACTION

### COUNT 1:   Breach of Contract
### (UConn)

138.   Plaintiff restates, realleges, and incorporates by reference all allegations set forth in every preceding paragraph as if set forth in this paragraph in full.

139.   Upon matriculating at UConn, John Doe entered into a contract with the university comprised of the policies and procedures promulgated by UConn as applicable to all students in exchange for tuition.  These policies included, without limitation, the Title IX Policy, Respondent Policy, the Student Code, and others.

140.    UConn's policies promised John Doe specific, enforceable rights, including but not limited to the following:

    a.   The right to submit written statements from witnesses in his own defense.

    b.   The right to notice of charges against him.

    c.   The right to know the Allegations against him.

    d.   The right not to be prejudged guilty and presumptively expelled on the day of his interview with Goepfrich.

    e.   The right to a fair and equitable investigation and decision.

    f.   The right to have the preponderance of the evidence standard applied to his case.

    g.   The right to see all evidence used against him at meetings and hearings in the investigation of his case in conformity with Title IX.

    h.   The right to have Goepfrich and UConn's decision-makers consider rather than exclude exculpatory evidence in compliance with Title IX.

    i.   The right to have an investigator make "reasonable effort" to obtain evidence.

141.    UConn breached each of the express promises that are embodied in its policies and contracts with John Doe.

142.    John Doe has been irreparably harmed by having his education terminated in the last semester of his senior year.  He has suffered reputational harm and will suffer diminished income and career opportunities due to his two-year suspension throughout his future career.

143.    UConn is therefore liable to John Doe for breach of contract.

**COUNT 2:    Due Process under the 5th and 14th Amendment to the United States Constitution and 42 U.S.C. § 1983 (Brian Goepfrich and UConn)**

144.    Plaintiff restates, realleges, and incorporates by reference all allegations set forth in every preceding paragraph as if set forth in this paragraph in full.

32

145.     The Fourteenth Amendment to the United States Constitution provide that no state shall "deprive any person of life, liberty, or property, without due process of law."  In this case Defendants are state actors subject to the Fourteenth Amendment.  The Fifth Amendment to the United States Constitution likewise provides, "No person shall … be deprived of life, liberty, or property, without due process of law."  In this case Defendants are state actors subject to the Fifth Amendment.

146.     Section 1983 of Title 42 of the U.S. Code provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…

147.     UConn and Goepfrich are state actors, acting within their capacity as agents of the State of Connecticut.

148.     A person has a protected liberty interest in his good name, reputation, honor, and integrity, of which he cannot be deprived without due process.

149.     A person has a protected property interest in pursuing his education, as well as in future educational and employment opportunities and occupational liberty, of which he cannot be deprived without due process.  John Doe has a constitutionally protected property interest in his continued enrollment at Defendant UConn and in his right to be free from arbitrary and unfair discipline from the policies, courses of conduct, practices and understandings established by Defendant UConn and the laws of Connecticut.  John Doe's constitutionally protected property interest further arises from the express and implied contractual relationship between Defendant UConn and John Doe.

150.     It is well established that Fifth and Fourteenth Amendment due process protections are required in the higher education disciplinary proceedings of state institutions.  A person who has been admitted to a university, and who has paid tuition to that university, has a protected property interest in continuing his education at that university until he has completed his course of study. The state cannot deprive a person of this interest without due process commensurate with the seriousness of the allegations and the potential discipline, sanctions, and repercussions he faced.  The allegations of "sexual assault" in this case resulted in a sanction that will have an irreparable and lifelong impact on John Doe.

151.     UConn and Goepfrich acted to deny John Doe's due process rights under the Fifth and Fourteenth Amendments to the United States Constitution by, among other things, the following:

a.   Denying John Doe notice of the charges against him.

b.   Denying John Doe a meaningful hearing and the opportunity to defend himself against his accuser.

c.   Denying John Doe the opportunity to cross-examine the witnesses against him.

d.   Denying John Doe the opportunity to present exculpatory evidence.

e.   Denying John Doe a fair and equitable proceeding, uninfected by bias.

f.   Denying John Doe any meaningful appeal.

g.   Presuming John Doe guilty before any investigation had been completed.

h.   Placing biased decision makers like Goepfrich to sit in judgment over John Doe.

i.   Presupposing the accusing student a "victim" and "survivor" and "traumatized."

152.     John Doe has been damaged and deprived of his education, suffered harm to his reputation, and threatened with physical violence on campus by Jane Roe and her friends who

urge others to "beat his ass." He suffers diminished income and career opportunity for all future time on account of UConn's and Goepfrich's failure to provide him with due process.

153.    UConn, Goepfrich, and other UConn employees acting under color of state authority have therefore violated John Doe's constitutional rights.

154.    John Doe is entitled to damages in an amount to be determined at trial, plus pre- and post-judgment interest, attorney fees, expenses, and costs, and to an injunction enjoining violations of the Fifth and Fourteenth Amendments to the United States Constitution in the investigation and adjudication of sexual misconduct complaints by UConn.

<u>**COUNT 3:**</u>    **Title IX, 20 U.S.C. § 1681**
**(UConn)**

155.    Plaintiff restates, realleges, and incorporates by reference all allegations set forth in every preceding paragraph as if set forth in this paragraph in full.

156.    Title IX of the Education Amendments of 1972 provides, in relevant part:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

157.    UConn is an institution of higher education that receives federal funding.

158.    UConn has promulgated its Title IX Policy, among others, to comply with Title IX and its implementing regulations, 34 C.F.R. 106.1 et seq., and with the Clery Act and its implementing regulations, 34 C.F.R. 34 CFR 668.1 et seq.

159.    Challenges to university disciplinary proceedings for sex discrimination against accused students fall in two categories: (1) "erroneous outcome" cases, in which the claim is that plaintiff was innocent and wrongly found responsible for an offense because of gender bias as a motivating factor behind the erroneous findings; and (2) "selective enforcement" cases, in which

the claim asserts that, regardless of the outcome or the student's guilt or innocence, the severity

of the penalty and/or conduct of the proceeding was affected by the student's gender.

160.    In John Doe's case, the "erroneous outcome" of his case is demonstrated by

UConn's unfair deprivation of John Doe's right, without limitation:

      a.    to submit written statements from witnesses in his own defense.

      b.    to notice of the charges against him.

      c.    to know the Allegations against him.

      d.    to a fair and equitable investigation and decision.

      e.    to have the preponderance of the evidence standard applied to his case.

      f.    to see all evidence used against him at meetings and hearings.

      g.    not to be prejudged guilty and presumptively thrown out of spring semester on the day of his interview with Goepfrich.

      h.    to have Goepfrich and UConn's decision-makers consider rather than exclude exculpatory evidence.

161.    Bias is demonstrated by, among other things, Goepfrich's presumption that a

female student who asked for a condom and removed her own underwear was conveying an

"ambiguous" message, a willful misinterpreted of John Doe's statement that this was an

***unambiguous*** expression of consent to sex.  Among other things, Goepfrich's transcription

would have trapped John Doe in an admission of guilt under UConn's Student Code.

162.    Goepfrich further demonstrated his bias in claiming that the female student's

untrue assertions of John Doe's "falling down" drunkenness was merely a "subjective"

impression, immune to refutation.

163.    Goepfrich and the Hearing Board excluded only John Doe's witnesses, each of

whom came forward with exculpatory evidence demonstrating Jane Roe's untruthfulness and the

truth of John Doe's consistent account of events.

164.    Goepfrich and the Hearing Board credited only female witnesses, even when they did not attend the Hearing Board and could not be reached by cross-examination.

165.    Goepfrich and the Hearing Board found not credible only the male witnesses.

166.    UConn has promoted and fostered an atmosphere of public pressure within the student body and has acquiesced to public pressure in the media and from federal and state government demanding more swift and severe reaction to female complaints of sexual assault at the expense of male accused students.  This is shown by the atmosphere at rallies and protests, which UConn's administration supports with resources.  This student and staff activism promotes slogans such as "believe the woman," "believe survivors," and "end victim blaming."

167.    UConn also selectively enforced its Title IX Policy against John Doe as a male student.

168.    Here, Goepfrich labored mightily in his judgment to credit Jane Roe's statements that John Doe was "falling down" drunk as "subjective" impressions, in the face of multiple witnesses willing to testify that he had not been "falling-down" drunk.  But his only conclusion was that John Doe was not so drunk as to be incapacitated.  His Judgment then declared the issue of intoxication "not pertinent" (Goepfrich's word for irrelevant) to the case.  The purpose was to insulate Jane Roe from any counter charge that she had engaged in non-consensual sexual touching, for example by grinding on John Doe's penis in the car.

169.    John Doe will be able to show UConn has engaged in a pattern and practice of selectively enforcing Title IX.  On information and belief, UConn has initiated complaints against men, where men initiated sexual touching of similarly situated female students.  In such cases, Goepfrich and others in UConn's Title IX bureaucracy have engaged in the kind of mental

Case 3:20-cv-00092   Document 1   Filed 01/20/20   Page 38 of 41

gymnastics exhibited by Goepfrich in order to bring charges against male students by finding female students "incapacitated."

170.     In short, UConn selectively applies standards of intoxication and incapacitation depending on gender.

171.     In addition, John Doe has a retaliation claim.  UConn \retaliated against John Doe when it effectively expelled him on the day of his interview (October 15, 2019), in violation of its policy and before any complete evaluation was even halfway complete.

172.     John Doe has been irreparably harmed by having his education terminated in the last semester of his senior year.  He has suffered reputational harm, been threatened with violence by Jane Roe and her friends on campus and will suffer diminished income and career opportunities due to his two-year suspension throughout his future career.

173.     UConn is therefore liable to John Doe under Title IX.

<u>COUNT 4:</u>     **Breach of the Covenant of Good Faith and Fair Dealing (UConn)**

174.     Plaintiff restates, realleges, and incorporates by reference all allegations set forth in every preceding paragraph as if set forth in this paragraph in full.

175.     Upon matriculating at UConn, John Doe entered into a contract with the university comprised of the policies and procedures promulgated by UConn as applicable to all students in exchange for their tuition.  These policies included, without limitation, the Title IX Policy, the Student Code, and others.

176.     Every contract under Connecticut law incorporates an implied covenant of good faith and fair dealing.  In addition, UConn expressly promised fair and equitable process in its policies, which were and are binding contracts with John Doe.

177.     UConn's policies promised John Doe specific, enforceable rights, including but not limited to the following:

    a.   The right to submit written statements from witnesses in his own defense.

    b.   The right to notice of the charges against him.

    c.   The right to know the Allegations against him.

    d.   The right to a fair and equitable investigation and decision.

    e.   The right to have the preponderance of the evidence standard applied to his case.

    f.   The right to see all evidence used against him at meetings and hearings in the investigation of his case.

    g.   The right not to be prejudged guilty and presumptively expelled on the day of his interview with Goepfrich.

    h.   The right to have Goepfrich and UConn's decision-makers consider rather than exclude exculpatory evidence.

    i.   The right to have Goepfrich use "reasonable efforts" to obtain evidence.

178.     To the extent that any terms of its policies cannot be enforced as express contract terms, UConn breached the implied covenant of good faith and fair dealing by failing to provide John Doe with a fair and equitable process.  UConn's unfairness is also demonstrated by, without limitation, its bias in favor of presumed "victims" and presumed "survivors," regardless of facts establishing whether accusing students have genuinely suffered victimization or "survived" anything.  UConn's bias against the accused breaches the implied covenant.

179.     John Doe has been irreparably harmed by having his education terminated in the last semester of his senior year.  He has suffered reputational harm, been threatened with violence by Jane Roe and her friends on campus and will suffer diminished income and career opportunities due to his two-year suspension throughout his future career.

180.     UConn is therefore liable to John Doe for breach of the implied covenant of good faith and fair dealing.

## PRAYER FOR RELIEF AND JURY DEMAND

WHEREFORE, Plaintiff prays this Court to grant the following relief:

i.     Declare Defendant University of Connecticut liable for breach of contract and in breach of the implied covenant of good faith and fair dealing;

ii.    Declare Defendant University of Connecticut in violation of Title IX of the Education Amendments of 1972;

iii.   Declare the University of Connecticut and Defendant Brian Goepfrich to have violated John Doe's Constitutional right to due process under 42 U.S.C. § 1983;

iv.    Order Defendant University of Connecticut to immediately restore John Doe to the UConn Class of 2020;

v.     Order Defendant University of Connecticut to expunge John Doe's transcript and college record of any reference to his wrongful sanctions and finding of "responsibility" for any and all sexual misconduct;

vi.    Order Defendant University of Connecticut to institute policies guaranteeing fair and equitable process for accused students;

vii.   Order Defendant University of Connecticut to pay all direct and indirect damages suffered by John Doe;

viii.  Order Defendants to pay John Doe's reasonable attorney fees and costs under 42 U.S.C. § 1988(b) and other applicable laws; and

ix.    Order such additional legal or equitable relief as the Court finds just and proper.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL CLAIMS SO TRIABLE**

Respectfully submitted,

Michael Thad Allen, Esq. (ct29813)
ALLEN LAW, LLC
PO Box 404
Quaker Hill, CT  06375
(860) 772-4738
m.allen@allen-lawfirm.com

for PLAINTIFF