UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JOHN DOE,<br>                    PLAINTIFF<br><br>vs.<br><br>UNIVERSITY OF CONNECTIUCT<br>AND BRIAN GOEPFRICH,<br>                    DEFENDANTS. | Civil Case No. 3:20-cv-00092<br><br><br>DATE: January 20, 2020 |

**MEMORANDUM IN SUPPORT OF EMERGENCY MOTION FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Plaintiff John Doe submits this Memorandum of Law in support of his Motion for

Temporary Restraining Order ("TRO") and Preliminary Injunction ("PI") under Fed. R. Civ. P.

65(a-b) and D. Conn. L.R. 7(a)(6).  He also submits the Affidavit of John Doe in support of this

motion, with exhibits filed under seal.

Until recently, John Doe was enrolled at Defendant University of Connecticut ("UConn")

with an unblemished record.  UConn is the flagship University of the Connecticut State Colleges

and Universities ("CSCU").

In September 2019, "Jane Roe" falsely accused him of rape.  UConn and its Student

Conduct Officer Brian Goepfrich, acting under color of state law, effectively expelled John Doe

on October 15, 2019 by preemptively placing a hold on his transcript and barring him from

registering for Spring Semester 2020.  They did this on the day of his first interview as part of

Goepfrich's so-called investigation.  Goepfrich had not even finished gathering evidence.

At the time, John Doe was just one semester short of completing his degree in UConn's

business school.  As pleaded in his Complaint, Defendants' unfair expulsion deprived John Doe

of due process of law in violation of the Fifth and Fourteenth Amendments to the United States

Constitution, breached UConn's own policies and contracts with John Doe, and violated Title IX

of the Education Amendments of 1972, 20 U.S.C. § 1681, et seq. ("Title IX").

1

The merits of John Doe's case overwhelmingly favor a TRO and PI. Defendants expelled John Doe for "sexual assault" despite his accuser's affirmative admissions that their sex was consensual. UConn backfilled its prejudgment of John Doe with a sham investigation and eventual hearing, which by its own standard of review provided no meaningful opportunity for John Doe to be heard. The sham began when UConn denied John Doe meaningful notice of the charges against him. Goepfrich then prevented John Doe from submitting statements from witnesses, contrary to the express terms of UConn's policy. UConn also concealed Jane Roe's allegations from him, another breach of UConn's express policy.

The sham ended with a nominal hearing, but only after John Doe had already been prejudged and effectively expelled. UConn's so-called Hearing Board disallowed John Doe from submitting exculpatory evidence or having his witnesses heard. John Doe could not question the witnesses against him. UConn discriminated against him on the basis of sex as a male accused student in the name of UConn's express policy to "support the victim." This ideological bias justified presuming John Doe guilty from the start. At the same time, it justified presuming his accuser *a priori* credible however contradictory her statements may be.

A second level appeal did result in commuting his expulsion to a two-year suspension until January 1, 2020. Even then, John Doe is at UConn's mercy and must reapply for admission, consult with a so-called Community Standards officer, and seek readmission to his degree program. John Doe will suffer irreparable harm if he is thrown out on this two-year suspension. In addition, UConn and Goepfrich effectively label him a sex offender, ruining his reputation, with an incalculable impact on lost opportunity and income into the indefinite future.

By contrast, neither UConn nor Plaintiff's accuser, Jane Roe, will suffer similar hardships, if any, if the Court enters a TRO and PI. Although Jane Roe first raised allegations of

rape in April 2019, UConn did nothing until September 2019. John Doe and Jane Roe coexisted without incident, working side-by-side at UConn's African American Cultural Center ("AACC").

## I. BACKGROUND

### A. John Doe's Consensual Sex with Jane Roe

John Doe is an exemplary member of the UConn student body. Until his unfair expulsion, he worked at the AACC and maintained a 3.5 GPA. (Affidavit of John Doe ("Doe Aff.," ¶ 2.) He is just one semester away from graduating with a major in Management Information Systems from the UConn business school. (Id.) John Doe has never been in any trouble. (Doe Aff., ¶ 3.) He had no disciplinary issues in high school, and no disciplinary issues in college until he was falsely accused of rape by Jane Roe. (Id.) John Doe has never been arrested. (Id.) He had dreams of working as a forensic specialist or in cybersecurity. (Id., ¶ 2.)

Until UConn's unfair expulsion, these dreams were coming true. They were the culmination of multi-generational aspirations. (Id.) John Doe's parents are first-generation immigrants from Jamaica. (Id.) Both his mother and father came to America seeking our first-rate system of higher education, economic opportunity, and a fair and equitable justice system. (Id.) They sought these opportunities not only for themselves but also for their son. (Id.) John Doe enrolled in UConn in Fall 2016. (Id.)

On the evening of April 5, 2019, John Doe attended an off-campus party with his roommate FW and with two friends, KW and JM, who are students of Central Connecticut State University. (Id., ¶ 8.) At approximately 10:00 pm, John Doe and FW shared some Captain Morgan Long Island Iced Tea. John Doe had only three shots. (Id., 9.) This premixed drink is

not as strong as hard liquor and is more like a strong wine.  (Id.)  It has only 17% alcohol

content.  (Id.)  This was the only alcohol that John Doe consumed that evening.  (Id.)

Jane Roe and her close friend JT later claimed that, hours later, John Doe was so drunk

he was "unbalanced … he would lean on the counter"; "falling over"; "needed help standing";

"stumbling"; "could not hold himself up"; and "not standing straight up."  (Doe Aff., **Exhibit B**

at 24-25, 45, 52.)  Undisputed testimony showed that this was not true and no other witness

confirmed.  John Doe did not drink at the party.  (*See* Doe Aff., **Exhibit B** at 40; **Exhibit F**

(excluded statements of JM and FW attached); **Exhibit N, ¶ 2**.)  Even Jane Roe's close friend JT

admitted she had not seen John Doe drinking at the party.  (**Exhibit B** at 25.)

Is also undisputed that Jane Roe and her friend JT initiated contact with John Doe and his

friend JM.  As the party wound down around 1:00 in the morning, Jane Roe and JT approached

John and JM from the kitchen of the house.  (Doe Aff., ¶ 10; **Exhibit B** at 47, 50, **Exhibit F**.)  JT

expressed interest in JM.  Jane Roe expressed interest in John Doe.  (Doe Aff., ¶ 10)  The other

men in the group, FW and KW, were ignored.  (Id.)

The six students, Jane Roe, John Doe, JT, KW, and FW, and JM left the party in JM's

car.  (Id., ¶ 11)  JM drove them to Blaze Pizza to get something to eat.  (Id.)  Piling into the

backseat were FW, JT, Jane Roe, and John Doe.  (Id.)  KW sat in the passenger seat.  (Id.)  The

full-size Nissan Altima sedan had room for all four students to squeeze into the backseat side-by-

side, yet Jane Roe climbed into John Doe's lap.  (Id.)  She later claimed that she was forced to do

so.  (**Exhibit B** at 15.)  But John Doe did not ask her to sit in his lap, much less force her.  (Doe

Aff., ¶ 11)  This was her affirmative choice.  (Id.)  Goepfrich and UConn's biased hearing panel

excluded witnesses prepared to testify that Jane Roe misrepresented this as well; Goepfrich

excluded this evidence from his Judgment.  (**Exhibit D** at 2-12, Goepfrich's "Judgment.")

4

During the ride to the pizzeria, Jane Roe began to lap dance, gyrating her hips and "grinding" on John Doe's penis.  (Doe Aff., ¶ 10; **Exhibit F** (excluded FW Statement); **Exhibit N**, ¶ 5.)  She later denied doing so, but her active role in the sexual activity was confirmed by multiple witnesses.  (*Id.*; compare **Exhibit B** at 52.)  Goepfrich excluded this evidence from his written decision.  (**Exhibit D**.)  The Hearing Board followed up by forbidding KW and FW to give testimony as live witnesses.  (Doe Aff., ¶¶ 50-51.)

KW, sitting in the front passenger seat, felt Jane Roe's knees pressing rhythmically against his seat back and understood this to be sexual activity: "I could also feel the knees of the girl sitting on [John Doe's] lap through the back of my seat.  I could feel that she was moving back and forth.  It was clear to me that these movements on [John Doe's] lap were sexual.  She was not just bumping my seat randomly."  (**Exhibit N**, ¶ 5.)  FW also saw Jane Roe lap dancing to the music in a sexual rhythm: "While we were driving to Blaze, the girl sitting on [John Doe's] lap was moving like she was dancing on his lap, moving her body like moving from her waist.  I didn't want to stare at them."  (**Exhibit F**, FW Excluded Statement.)

After Jane Roe initiated sexual touching, John Doe reciprocated by reaching around and "fingering" her vagina.  (**Doe Aff.**, ¶ 12.)  It is undisputed that Jane Roe consented to this touching.  (**Exhibit B** at 15.)  She made it and moaning sounds and seemed to be enthusiastic, active participant in this sexual behavior.  (Doe Aff., ¶ 12.)

Later, Jane Roe denied initiating any sexual contact with John Doe.  (**Exhibit B** at 52.)  Goepfrich assisted by scrubbing his Judgment of all evidence of Jane Roe's active and willing participation in sexual activity.  This included refusing to accept FW's witness statement (in breach of UConn policy) and refusing to interview KW (also in breach of its obligation to conduct a thorough investigation).  (**Exhibit D**.)

5

The group's next stop was the Nathan Hale Inn, which UConn uses for student housing. (Doe Aff., ¶ 13.)  FW and John Doe shared a room at Nathan Hale.  (Id.)  At this point, John Doe still intended to go home to bed, alone.  (Id.)  But Jane Roe called out to John Doe to get back in the car, join her and JT, and come back to their dormitory, called West.  (**Exhibit B** at 28, 47; **Exhibit N**, ¶ 7.)  Only FW left the group.  John Doe rejoined Jane Roe at her invitation to come to her dorm.  (Doe Aff., ¶ 13.)  Jane Roe also admitted this to her roommate the next morning: "When they got back from the party it was like two go to this room [JT's] and the other two go to the other room [Jane Roe's]. This was not blatantly stated but a mutual agreement after all coming back to the dorm."  (**Exhibit B** at 44.)

Contrary to Jane Roe's changing story after the fact, her invitation was blatantly stated. Both JM and KW witnessed Jane Roe plead with John Doe to return to her dormitory.  (**Exhibit N**, ¶ 7; **Exhibit B** at 47.)  According to JM, "… both [women] were saying things to [John Doe] like, let's hang out, come over to our place. …  I'm sure that both women wanted [John Doe] to get back in and were saying these things together.  I am sure that [Jane Roe] was participating in this…"[1]  (**Exhibit F**, JM Excluded Statement).

KW witnessed the same thing.  When John Doe got out, "both girls in the backseat called out to him to pull him back into the car.  They wanted him to come back to their place. …  It was clear that one was interested in [JM] and the other was interested in [John Doe]."  (**Exhibit N**, ¶ 7.)  Jane Roe misrepresented this to further conceal her active participation in the evening's events, and Goepfrich excluded this exculpatory evidence.  (**Exhibit D** at 6.)

---

[1] KW did not witness this because he got out on the opposite side of the car to head to his room, and he could not hear what the others were saying.

JM parked his car near West dormitory.  (Doe Aff., ¶ 14.)  The women led him and John Doe to their dorm rooms.  (Id.)  Months later, Jane Roe claimed that she had intended to invite everyone to her room to watch Netflix and have a sort of pizza party.  As credited by Goepfrich, she said, "I made it a point that we can all, as a group, watch TV in my room as a way to infer [sic.] that I had no intentions of doing anything sexual."  (**Exhibit D** at 4.)  This was preposterous on its face.  Once again, Jane Roe avoided her affirmative, active role in the sexual activity.  It is an objective fact that KW remained in the car.  (Doe Aff., ¶ 14; Exhibit N, ¶ 7.)  Jane Roe never invited him to do anything "as a group."  As he said, "I was the 'fifth wheel' but I didn't care."  (**Exhibit N, ¶ 7.**)

The account of what happened in the bedroom comes down to Jane Roe's word against John Doe's word.  Once John Doe was alone in Jane Roe's room, John Doe sat on Jane Roe's roommate's bed, but Jane Roe soon called him over to sit down on her bed.  (Doe Aff., ¶ 15.)  John Doe sat with his back to the wall across the bed toward the bed's foot.  (Id.)  Jane lifted her legs and put them over John Doe's lap.  (Id.)  John Doe reciprocated by rubbing her legs.  (Id.)

John Doe started to pull down Jane Roe's pants.  (Id., ¶ 16.)  She then asked, "Do you have a condom?"  (**Exhibit B** at 43; Doe Aff., ¶ 16.)  Jane Roe later claimed that John Doe didn't have one, and that this was an "excuse" not to have sex.  (**Exhibit B**, Text Messages at 35.)  But she later admitted that John Doe did have a condom.  (**Exhibit B** at 15.)  He got up and took off his pants, from which he retrieved the condom.  (Exhibit B at 15, 29; Doe Aff., ¶ 14.)  When he turned back to the bed after putting on the condom, Jane Roe had voluntarily removed her own underwear.  (**Exhibit B** at 29; Doe Aff., ¶ 16.)  This and her request for a condom, John Doe told Goepfrich, "showed her consent. It was ***unambiguous***" (emph. added).  (**Exhibit B** at 43.)  When John Doe explained these events to Goepfrich, however, Goepfrich wrote "***ambiguous***" in

7

his interview transcript.  (**Exhibit B** at 43.)  This speaks volumes about Goepfrich's bias.  He apparently comprehends it as ambiguous that a woman would directly ask a man to get a condom and then remove her own underwear while the man puts the condom on.  To Goepfrich, even the clearest indication of consent does not indicate consent so long as a female student expresses regret after the fact.

After about 15 minutes, Jane Roe and John Doe proceeded to consensual sexual intercourse, spending about 5 minutes in each of three different positions, which John Doe described in detail.  (**Exhibit B** at 29-30; Doe Aff., ¶ 17.)  In the second position, Jane Roe got on top of John Doe and guided his penis into her vagina.  (**Exhibit B** at 30; Doe Aff., ¶ 17.)  She was an active, willing participant in their sexual activity.  (Id.)

After they had sex, John Doe recalled that Jane Roe "left the bedroom to clean herself. This did not occur prior to sex."  (**Exhibit B** at 41.)  Their sexual encounter concluded approximately 30 minutes after John Doe and Jane Roe were first alone in her room.  (Doe Aff., ¶ 18.)

In Jane Roe's changing account of the same events, she continued to contradict herself. Jane Roe claimed that she "froze," which Goepfrich credited.  (**Exhibit D** at 9.)  At the same time, she admitted that "she was [first] on her back and later … they had switched and she was on top of him while he was laying on his back."  (**Exhibit B** at 9.)  She had no explanation for how she could "freeze" but still maintain an active position on top of John Doe.  Jane Roe admitted that she was "cooperative" and "partook" in the sex -- hardly an act of "freezing" -- even as she began to accuse John Doe of "rape" the next morning to her roommate.  (**Exhibit B** at 44.)  Goepfrich never asked about this inconsistency or analyzed this in his Judgment. (**Exhibit D**.)

Jane Roe claimed that their sex was "rape" because she had made up "excuses" not to have sex, said "no," and "stop." (*See e.g.*, **Exhibit B,** Text Messages at 16-17.) John Doe insisted that she never indicated "no" or "stop." What is more, he pointed out her active role in initiating sexual activity. *(Id.* at 16-18.) Equally important, Jane Roe never alleged force or coercion of any kind. "It was not a forced raped [sic.]," she told her roommate the next morning. (**Exhibit B** at 44.) John Doe never forced her to be "cooperative" or climb on top of him. Not even Geopfrich found John Doe responsible for using "coercion" or "force" under UConn's sexual misconduct policy. (**Exhibit D; Exhibit O; Complaint, ¶ 64.**)

As JM and JT rejoined John Doe and Jane Roe (after JM and JT had had consensual sex in her dorm room), they overheard the women giggling and having a good time as they left. (**Exhibit B** at 47; Doe Aff., ¶ 18.) Jane Roe admits that she did not tell JT that she had been "raped." (**Exhibit B** at 15.) Later, she claimed this was because she was "shocked." (Id.)

## B.  Jane Roe Regrets Sex after JT Forbids Her to Have Sex with John Doe

There is no dispute that quickly Jane Roe regretted having sex with John Doe. What is disputed is why. As confirmed in contemporaneous text messages, Jane Roe's friend JT had previously expressed sexual interest in John Doe on March 31, 2019, just days before the April 5 party. (**Exhibit B**, Text messages at 34; Doe Aff., ¶ 10.) Urged by JT, Jane Roe text messaged John Doe saying, "one of my friends [JT] wanted to fwy [fuck with you] but they wanted to know if you fw anyone before shooting their shot." (Id.) Jane Roe avoided disclosing these text messages to UConn during its investigation. (**Exhibit B**, Jane Roe Text Messages at 16.)

Months after the events in question, Jane Roe claimed that she left her dorm room multiple times to "avoid" sex with John Doe. (**Exhibit B** at 15.) Crucially, she claimed to have abandoned John Doe alone in her room before they had sex to talk to JT. (Id.) JT remembered

that Jane Roe appeared "maybe 10-15 minutes" after she was alone with JM in her room, but she did not recall precisely.  (**Exhibit B** at 24.)  It was after the couples split up to go to separate rooms.  (Id.)

What is clear is that, once at her door, Jane Roe asked JT's permission to have sex with John Doe:

> We talked outside of the room.  She was like [John Doe] wants to have sex.  She knew I had [a] crush on him.  I told her no you could not.  She said okay and she went back to her room.…  From my knowledge I did not know that anything occurred.…  He is trying to have sex with me.  And I was like no.  And she said okay fine.  ***She was asking me for permission.***

(Id. at 24-25 (emphasis added).)

JM, who was with JT in her room, could not hear what the two women discussed at the door.  (**Exhibit B** at 48.)  But he recalled that this happened right before he and JT began their own physical intimacy and testified to this at the Hearing Board.[2]  (Doe Aff., ¶¶ 46-47.)  He placed their sexual intercourse in the latter half of the hour that the couples spent in the dormitory together.  (Id.)  This placed Jane Roe's visit to JT's door roughly 30 minutes after the couples had split up (and all witnesses agreed that the episode lasted approximately an hour from the time the women led JM and John Doe into the dormitory).  (Id.)  Crucially, the timing places Jane Roe's request for permission ***after*** she had already had consensual sex with John Doe.  (Id.)  John Doe's testimony placed their sexual intercourse in the first half hour of their time together in the dormitory.  (Id., ¶ 18.)

Equally important, JT never expressed disquiet about her friend Jane Roe to JM.  (Id., ¶ 47.)  There was not a single sign of alarm.  (Id.)  There was no sign she was concerned that her friend might be sexually assaulted.  (Id.)  JT's account confirmed this, in which she said she "did

---

[2] JM testified to this at the Hearing Board.

not know that anything occurred." (**Exhibit B** at 25.) Months later, Jane Roe complained that she had fled her room because she feared being sexually assaulted and because John Doe was supposedly falling down drunk. (**Exhibit B** at 15.) She claimed John Doe "wouldn't listen to me and was still very drunk." (Id.) Jane Roe also later denied asking JT's "permission." (Id. at 53.) Obviously, that would imply she desired and was seeking sex. But she took pains to misrepresent her own active participation in the evening's events at every step of the process.

Nevertheless, Jane Roe's account of seeking permission was entirely consistent with JT's:

> I left my room and walked to my friends [sic] room to tell her that he was trying to have sex with me. She responded and simply said "no", given she at one point liked him.

(**Exhibit B** at 15.) This was not about fear of sexual assault. No one would instruct a friend to avoid someone who threatened sexual assault merely because they "at one point liked" the potential "assailant." This was indeed about fear, but it was fear of compromising her friendship with JT.

Jane Roe added:

> I then returned to my room where [John Doe] still was and grabbed some shorts and went to the bathroom so I could change before getting in my bed.

*Id*.

Putting aside how Jane Roe tied herself in knots, her account requires one to believe that she fled her bedroom to shun aggressive sexual advances, disclosed her predicament to her friend JT -- who received not the slightest indication that anything was actually wrong -- then dashed back to change into even less clothing, so she could return directly to John Doe and slip into bed to be "raped."

11

Had the preponderance of the evidence standard been properly applied, the evidence tells a much simpler story:  After John Doe and Jane Roe had consensual sexual intercourse, she left the room to clean up (as John Doe said) and visited her friend about 30 minutes after the couples entered the dormitory.  This timing was confirmed by JM, who remembered that it was right before JM and JT had consummated intercourse.  She met with her friend's strong disapproval of her having sex with John Doe.  She then faced an impossible situation.  Jane Roe had betrayed her good friend's trust.

Permission retroactively denied turned instantly into regret after the fact.  From that moment on, Jane Roe did everything she could to erase her active role in the evening, changing the story as she went.

Six days after their encounter, Jane Roe sent text messages to John Doe, bombarding him with accusations of sexual assault.  (**Exhibit B**, Text Messages at 34-37; Doe Aff., ¶¶ 19-22.) She alleged that she had said "no and to stop before and during sex."  (Id.)  John Doe immediately disputed these allegations as untrue: "I'm so sorry Omfg  No way you actually said that  Because I would've known  And you told me to put on a condom I'm so confused." (**Exhibit B** at 35.)

Then Jane Roe raised the first of her many obvious misrepresentations.  She claimed that she had made many "excuses" not to have sex, "One of which was you not having a condom." (Id.)  But she later admitted he had a condom.  (**Exhibit B** at 15.)  Jane Roe also claimed, "I NEVER said for you to come to west [dormitory]" -- a statement that multiple witnesses confirmed as false.  (Id. at 36.)  She had even contradicted these statements in admissions to her roommate the next morning, April 6, 2019.  (Id. at 44.)  Jane Roe told her roommate that there

12

was a mutual agreement "[w]hen they got back from the party, it was like two go to this room and the other two go to the other room … after all coming back to the dorm."  (Id.)

### C.  The Policies and Contracts of UConn

UConn has promulgated various policies that constitute contracts with its students upon their matriculation and payment of tuition.

Some of the contractual terms between UConn and its students are found in the "University of Connecticut Policy against Discrimination, Harassment, and Related Interpersonal Violence."  ("Title IX Policy," **Exhibit O**) and in the policy "Sexual Misconduct Cases Involving a Student Respondent."[3]  ("Respondent Policy," **Exhibit P**.)  UConn promises its students, including John Doe, that it "does not unlawfully discriminate in any of its education or employment programs and activities on the basis of individuals' race, color, ethnicity, religious creed, age, sex, marital status, national origin, ancestry, sexual orientation, genetic information, physical or mental disability …, veteran's status, prior conviction of a crime, workplace hazards to the reproductive system, gender identity or expression, or membership in any other protected classes at set forth in state or federal law."  Title IX Policy at 4.

UConn promises that its Title IX Policy prohibits specific forms of behavior that violate, among others, Title IX of the Education Amendments of 1972 ("Title IX") and the Violence against Women Reauthorization Act of 2013 ("VAWA"), as well as related state and federal antidiscrimination laws.  *Id*.  UConn's compliance with these laws includes, but is not limited to, promises to abide by the implementing regulations of the statutes.  UConn promulgates its Title IX Policy and Respondent Policy to fulfill its obligations under Title IX as well as its reporting

---

[3] In the parallel justice system that campuses maintain for sexual misconduct cases, "respondent" is the equivalent of the Defendant in the criminal or civil justice system.

obligations under the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime

Statistics Act (the "Clery Act") and its implementing regulations. *Id*.

The Title IX policy defines "Sexual Assault" as follows:

**Sexual Assault** consists of (1) Sexual Contact and/or (2) Sexual Intercourse that occurs without (3) Consent.

1. Sexual Contact (or attempts to commit) is the intentional touching of another person's intimate body parts, clothed or unclothed, if that intentional touching can reasonably be construed as having the intent or purpose of obtaining sexual arousal or gratification.

2. Sexual Intercourse (or attempts to commit) is any penetration, however slight, of a bodily orifice with any object(s) or body part. Sexual Intercourse includes vaginal or anal penetration by a penis, object, tongue or finger, or any contact between the mouth of one person and the genitalia of another person.

3. Consent is an understandable exchange of affirmative words or actions, which indicate a willingness to participate in mutually agreed upon sexual activity. Consent must be informed, freely and actively given. It is the responsibility of the initiator to obtain clear and affirmative responses at each stage of sexual involvement. Consent to one form of sexual activity does not imply consent to other forms of sexual activity. The lack of a negative response is not consent. An individual who is incapacitated by alcohol and/or other drugs both voluntarily or involuntarily consumed may not give consent. Past consent of sexual activity does not imply ongoing future consent.

Consent cannot be given if any of the following are present: A. Force, B. Coercion or C. Incapacitation.

A. Force is the use of physical violence and/or imposing on someone physically to gain sexual access. Force also includes threats, intimidation (implied threats) and/or coercion that overcome resistance.

B. Coercion is unreasonable pressure for sexual activity. Coercion is more than an effort to persuade, entice, or attract another person to have sex. Conduct does not constitute coercion unless it wrongfully impairs an individual's freedom of will to choose whether to participate in the sexual activity.

C. Incapacitation is a state where an individual cannot make rational, reasonable decisions due to the debilitating use of alcohol and/or other drugs, sleep, unconsciousness, or because of a disability that prevents the individual from having the capacity to give consent. Intoxication is not incapacitation and a person is not incapacitated merely because the person has been drinking or using drugs. Incapacitation due to alcohol and/or drug consumption results from

14

> ingestion that is more severe than impairment, being under the influence, drunkenness, or intoxication. The question of incapacitation will be determined on a case-by-case basis. Being intoxicated or incapacitated by drugs, alcohol, or other medication will not be a defense to any violation of this Policy.

Id. at § IX.D.

UConn has also promulgated a student conduct code, "The University of Connecticut Responsibilities of Community Life: The Student Code" ("Student Code"). (**Exhibit E**.) Part III of the Student Code sets forth additional rules of student conduct. Among the conduct prohibited by the Student Code is "[e]ndangering behavior, which includes, but is not limited to, conduct that threatens or endangers the health or safety of any person including one's self." (Id. at Part III.B.5.)

The Student Code also establishes a parallel justice system of campus courts that UConn convenes to pass judgment over the private lives of its students. UConn uses a single investigator model, a method of adjudication that has been universally condemned, even by victims' advocacy organizations and organizations that promote "risk management" for university administrations, such as the Association of Title IX Administrators (ATIXA).[4] UConn sets up a single college administrator (in John Doe's case, Defendant Goepfrich) as detective, prosecutor, judge, and one-man jury over the accused student. Once the single investigator passes judgment, his decision is subject to review by a Hearing Board. But the standards of review render the hearing meaningless. Accused students are afforded no right to meaningfully question witnesses, no safeguards against the arbitrary exclusion of exculpatory evidence, no meaningful hearing, and no meaningful right of appeal. Student Code, Part IV.D.

---

[4] ATIXA, Comment, Docket ID No. ED 2018-ED-0064, Proposed Regulations Implementing Title IX of the Education Amendments of 1972, 34 CFR Part 106 at 32 avail. at https://cdn.atixa.org/website-media/o_atixa/wp-content/uploads/2012/01/18120231/ATIXA-NPRM-Comments-FInal.pdf.

Following UConn's single investigator model, the Student Conduct Officer (here Defendant Goepfrich) passes judgment without a hearing or other opportunity for the accused to confront or question witnesses. The single investigator does not provide the accused with the evidence or statements that will be used against him in forming his judgment, even as Goepfrich showed, when this is required by UConn's Student Code and Title IX Policy.

Once the single investigator passes judgment, UConn offers the accused a Hobson's choice. He may either submit to the judgment or request an extremely limited appeal before an administrative "Hearing Board."

This hearing is not meaningful. It's scope of review is limited to the following:

  i.   whether the investigation was conducted in a fair, impartial, and reliable
       manner;

  ii.  the information is sufficient to support the factual findings;

  iii. and there is a rational basis, applying a preponderance of the evidence
       standard for the recommended findings regarding a potential violation of
       The Student Code.

(Student Code, Part IV.D.3.j.) Especially in a he-said/she-said scenario, this makes the single investigator's judgment virtually unassailable. The accused student will never be able to show, especially to a Hearing Board made up of the single investigator's fellow Student Conduct Officers, that a decision of one of their peers lacks sufficient evidence or is wholly *irrational*. A single investigator who asserts that he "believes the [alleged] victim" in a he-said/she-said scenario will always be upheld for making a decision on a "sufficient," "rational" basis.

After the Hearing Board affirms the single investigator's judgment, the accused has one final appeal to an ill-defined "next level of student conduct authority." (Student Code, Part IV.F.) The final level of appeal is even more strictly limited. The second appeal considers only whether the administrative hearing (not the original investigation or judgment) was conducted in

16

conformity with UConn's procedures; whether the accused had "a reasonable opportunity to prepare and present information" at the first-level appeal; whether the sanctions were appropriate; and whether there are "other relevant facts not brought out in the original hearing, because such information and/or facts were not known to the person appealing at the time of the original ministry of hearing." (Id.)

At no point is the accused permitted a de novo review of the single investigator's judgment. Neither the Hearing Board nor the second-level appeal is required to give written reasons their decisions. And John Doe did not receive written decisions explaining the denial of his appeals. (**Exhibit L**; **Exhibit M**.) At no point in UConn's student conduct process can the student challenge the judgment of the single investigator on the merits. At no level may the accused student appeal to an independent decision-maker outside the so-called "Community Standards" bureaucracy of UConn. There is no independent decision-maker without a vested interest in protecting the administrative office of "Community Standards."

### D. Goepfrich Invents his Own Rules in the Biased Investigation Amidst Public and Private Pressure to "Believe the Woman"

On April 16, 2019, Jane Roe made a written allegation to Dr. Wilena Price, director of UConn's African American Cultural Center ("AACC"). (**Exhibit B** at 13.) UConn's Title IX Policy provides that "[t]he respondent [i.e., John Doe] will be notified of the allegation." (Respondent Policy, Definitions, Respondent.) It also defines "Allegations" as the report "file[d] … concerning alleged misconduct of any student … in writing, … by the *individual reporting the conduct* …" (Title IX Policy, § IV(A).) Goepfrich withheld Jane Doe's second Allegation, despite John Doe's repeated requests to see it, until after he issued his Judgment. (Doe Aff., ¶¶ 24-26.) And UConn never produced a copy of Jane Roe's original Allegation to John Doe. (Id.) The existence of this first statement only became apparent during the Administrative

17

Hearing held on December 16, 2019.  (Id., ¶ 49.)  But at that hearing, UConn's Hearing Board simply accepted Jane Roe's representation that her first statement was more or less the "same" as what she submitted months later.  (Id.)

Back in April, however, Jane Roe did not pursue a formal complaint against John Doe. (**Exhibit B** at 15-16.)  She never reported any incident to the police, nor did she seek a restraining order.  UConn took no action.  Despite the allegation of "rape," UConn did not impose any interim administrative actions;[5] UConn did not impose any no contact order.  (Doe Aff., ¶ 50.)  John Doe and Jane Roe continued to work at the AACC together.  (Id.)  They did so without incident.  (Id.)  There is absolutely no evidence that Jane Roe's education suffered in any way.

But after summer vacation 2019, Jane Roe changed her mind.  Throughout the time of her and John Doe's enrollment at UConn, there was a prevalent atmosphere of student activism and public pressure to encourage the prosecution of male students on campus in order to combat perceived "sexual violence."  (*See* Complaint, ¶¶ 83-87 and public source documents subject to judicial notice as cited.)  This not only influenced Jane Roe; it also influenced UConn's Title IX Office.  The mantra of student protest was, "people are to be believed when they have experiences of sexual assault," or, reduced to placard slogans: "Believe Survivors" and "Believe Women."[6]  (Id., ¶ 85)

---

[5] The Student Code, Part V defines "Interim Administrative Action" as anything from "interim university suspension," removal from student housing, to "other necessary restrictions" where the Vice President for Student Affairs finds that there is a "threat of imminent harm to persons or property."
[6] See Courtney Gavitt, Sexual Assault Awareness Month: UConn Fights the Violence and You Can Too, The Daily Campus, April 8, 2019, https://dailycampus.com/stories/2019/4/8/sexual-assault-awareness-month-uconn-fights-the-stigma-and-you-can-too; rally against Kavanaugh nomination, https://www.wtnh.com/news/education/uconn-students-rally-in-support-of-christine-blasey-ford-against-kavanaugh-nomination/.

As announced by Office of Institutional Equity ("Title IX Office"), the goal of Title IX enforcement, in their words, is to "support [presumed] victims and [presumed] survivors" and presuppose "trauma" before investigating the facts — exactly what happened to John Doe.[7] (Id., ¶ 86.) By contrast, UConn's Title IX Office does not issue policy statements proclaiming, "believe the evidence."

Jane Roe renewed her complaint on or around September 16, 2019. (**Exhibit D** at 14.) She then submitted a new statement composed months after the first Allegation. (**Exhibit B** at 15.) Unsurprisingly, it differed significantly from the only other contemporaneous report ever provided to John Doe, which he was provided only in Goepfrich's Judgment. This is the account that Jane Roe divulged to her roommate the day after the party on April 6, 2019. (**Exhibit B** at 44-45.) On information and belief, Jane Roe's second, September Allegation also differs from her first April Allegation, which UConn still withholds from John Doe.

Upon Jane Roe's second Allegation, UConn's Title IX bureaucracy swung into action. Goepfrich began an investigation on September 19, 2019. (**Exhibit D** at 3.) John Doe received a letter suggesting a violation of the Student Code. (**Exhibit A.**) Goepfrich notified John Doe that he was accused of "non-consensual sexual contact and nonconsensual sexual intercourse" but no other charge. (Id.) Even this notice was defective and did not conform to UConn policy. UConn has no rule titled, "non-consensual sexual contact and nonconsensual sexual intercourse"; Goepfrich apparently referred to UConn's sexual misconduct rule defining "Sexual Assault." (**Exhibit O**.) But John Doe could only guess. UConn provided no notice of the charge of "endangering behavior," which Goepfrich later included only in issuing his Judgment. (**Exhibit D**.)

---

[7] See https://today.uconn.edu/2017/09/uconn-statement-potential-federal-overhaul-title-ix/.

Contrary to the express language of UConn's Title IX Policy and in violation of Title IX itself, Goepfrich refused to provide John Doe with a copy of Jane Roe's Allegations -- either the April Allegation or the September Allegation.  (Doe Aff., ¶¶ 24-26.)  (The former has never been provided.)  (Id.)

Goepfrich called John Doe in for an interview October 15, 2019.  (Id., ¶ 25.)  When John Doe went to register for the Spring 2020 Semester, he found that he had been blocked from registering and his transcript was locked on that very same day.  (Id., ¶¶ 24-30.)  UConn had already effectively discontinued his education him before Goepfrich had even collected the evidence.  (**Exhibit G**.)  The outcome of the investigation was already prejudged.

John Doe also submitted statements from JM and FW attesting, among other things, to Jane Roe's consistent, affirmative, and active role in initiating sexual contact that evening. (**Exhibit F**.)  UConn's Title IX Policy expressly states that the "respondent … may … provide witness statements and any documentation that may be relevant to the facts of the incident." (Title IX Policy, § IV(B)(2).)  In violation of this policy, Goepfrich forbid these statements and refused to accept them.  (Doe Aff., ¶¶ 27-28.)  Goepfrich insisted that he could only consider exculpatory witness testimony if the witnesses individually contacted him to submit to his interview.  (Id.)  Nowhere does UConn's Title IX Policy require this.

This prejudiced John Doe.  He remained unaware that Jane Roe claimed to have fled the bedroom before they had sex and was unable to submit exculpatory evidence addressing this disputed fact, on which Goepfrich placed excessive importance.  (Id., ¶ 25; compare **Exhibit D** at JD00008.)  In interviews with John Doe's witnesses, Goepfrich also "cleaned" the exculpatory evidence from the record.  (*Compare* Judgment.)  For example, he did not ask FW if the contact he had witnessed in the car was sexual in nature.  (**Exhibit N**, ¶ 5; **Exhibit B** at 50-51.)

Goepfrich did not ask JM about the timing of his sexual encounter with JT or about the disputed nature and timing of Jane Roe's appearance at her door, although she made clear she was unsure.  (**Exhibit B** at 24.)  JT was never made available for questioning by John Doe.  (Doe Aff., ¶ 36.)  During the crucial phase in which Goepfrich passed judgment on John Doe, John Doe was forbidden to question anyone or even know who Goepfrich was interviewing as a witness against him.  (Id., ¶ 26.)  Yet Goepfrich could shape the testimony of John Doe's witnesses without John Doe present.  (Id.)

Goepfrich also excluded John Doe's roommate KW as a witness and declared that KW "was not able to provide information to the investigation."  (**Exhibit D** at 8.)  In violation of Title IX and the express language UConn's own policies, Goepfrich refused to interview KW.  (Id.; Student Code, Part IV.B.2 (requiring "reasonable effort" to obtain evidence).)  Had Goepfrich interviewed KW, KW would have confirmed Jane Roe's sexual contact in the car, confirmed her solicitation of John Doe to return to her room when he exited to Nathan Hale Inn, confirmed that Jane Roe never invited everyone "as a group" to some sort of TV and pizza party in her room, and confirmed John Doe's consistent account of events.  (**Exhibit N**.)  This exclusion of exculpatory evidence also violated Title IX.  (2017 Q&A, Answer 6 ("equitable investigation of a Title IX complaint requires a trained investigator to analyze and document the available evidence to support reliable decisions, objectively evaluate the credibility of parties and witnesses, ***synthesize all available evidence—including both inculpatory and exculpatory evidence***—and take into account the unique and complex circumstances of each case") (emph. added)).

In his Judgment of November 14, 2019, Goepfrich endorsed Jane Roe's story completely, ignoring all misrepresentations and inconsistencies.  (**Exhibit D** at 12.)  He found John Doe

"responsible" (the campus-court equivalent of "guilty" in a criminal trial) of "Sexual Assault," a charge for which John Doe was not given notice.  (Id.; *compare* **Exhibit A**.)  Goepfrich went even further, however.  Goepfrich's Judgment included the additional finding of "endangering behavior" (*Id.*; Student Code, Rule No. 5).  This charge was an escalation initiated solely by Goepfrich, and without notice.  (Doe Aff., ¶ 32.)  It was another indication that, throughout this process, Goepfrich acted as a zealous prosecutor rather than as an unbiased fact finder.

Goepfrich's Judgment condemned John Doe to permanent expulsion, terminating his education.  (**Exhibit D** at 12.)  Of course, John Doe's expulsion was, for all practical purposes, already preordained on the day of his first interview, October 15, 2019.  His transcript was blocked and his enrollment in Spring 2020 Semester barred.  (Doe Aff., ¶¶ 29-30; **Exhibit G**.)

If left to stand, Goepfrich's Judgment effectively guaranteed John Doe's rejection from any future school to which he applies.  (Doe Aff., ¶¶ 7, 59-60.)  He will have to disclose his expulsion for a sex offense to any future institution of higher education.  (Id.)  This places an added burden on a young African-American man from an immigrant family, one which will erase his good grades, his impeccable prior disciplinary record, and will undo, through the parallel campus courts, the fact that he has no criminal background.  (Id.)

**E.  UConn Deprives John Doe of a Meaningful Hearing**

Goepfrich submitted his Judgment by email/letter on November 14, 2019.  (**Exhibit D**.) But Goepfrich's chicanery did not end there.  In conveying his Judgment, Goepfrich requested that John Doe "email me within *four business days* (5:00 PM, Tuesday, November 19, 2019, November 19, 2019 [sic.]) to inform me of the resolution process you would like this case to be resolved by way of."  (Doe Aff., ¶¶ 34-35; **Exhibit D** at 1.)

22

Four business days from November 14, 2019 fell on November 20, 2019, not on the 19th as Goepfrich indicated.  Yet when John Doe asked for Goepfrich to correct the mistake and grant him the full four days, Goepfrich arbitrarily denied him the additional day.  (Doe Aff., ¶¶ 35-36; **Exhibit H**.)  When asked to clarify what rule for counting time or what policy Goepfrich relied upon, Goepfrich refused.  (Id.)  He merely insisted that John Doe respond one day early.  (Id.)

John Doe's only option, short of acquiescing to an immediate, unfair expulsion, was to request UConn's unconstitutionally limited review of the Judgment through an Administrative Hearing under UConn's Title IX Policy.  (Doe Aff., ¶ 37; School Code, Part IV.)

UConn first scheduled the Hearing Board to convene on December 4, 2019, the Monday after Thanksgiving break.  (Doe Aff., ¶ 38.)  Goepfrich directed John Doe to submit a list of witnesses, a summary of their expected testimony, and any statement or additional evidence he wished to present by 9:00 a.m. on December 2, 2019.  (Id.; **Exhibit I**.)

This was prejudicial in the extreme.  The deadline fell at 9:00 a.m. on the Monday morning after Thanksgiving break.  (Doe Aff., ¶ 39.)  John Doe had to round up all his witnesses and compose his statement during a time in which it is almost impossible to reach anyone on a college campus due to the holiday.  (Id.)  He asked that the Hearing Board be postponed for this reason.  (Id., ¶ 40)  UConn did not respond until *after* the 9:00 a.m. December 2, 2019 deadline, by which time John Doe had already rushed to submit his materials.  (Id.)  John Doe was granted an extension of the hearing until December 16, 2019.  (**Exhibit J**.)  This was also the middle of finals week, placing John Doe under extreme pressure.  (Id., ¶ 39.)

But even more unfair than being whipsawed by UConn's Title IX bureaucracy, there was no meaningful way to appeal Goepfrich's Judgment.  The Hearing Board's review is limited to three grounds: 1) whether the investigation was "conducted in a fair, impartial, and reliable

23

manner"; 2) whether "the information is ***sufficient*** to support the factual findings"; and 3) whether "there is a ***rational basis***..."  (Student Code, Part IV.D.3.j (emph. added).)  John Doe now bore the burden to prove Goepfrich's Judgment irrational or to show that there was no sufficient evidence to support it.  This left John Doe with no meaningful way to contest Goepfrich's decision to "believe [presupposed] victims" or "support [the presumed] survivors" -- as UConn's Title IX Policy and Title IX Office directed Goepfrich to do.  The Hearing Board is bound by UConn's rules to sustain the single investigator's Judgment if any information supports it and it has some "rational" basis.  (Student Code, Part IV.D.3.j.)

The UConn Hearing Board sat, in other words, not to assess the evidence but merely to confirm Goepfrich's prosecutorial Judgment on any possible ground.  And what had been typical of Goepfrich's investigation and Judgment also continued at hearing.  The Hearing Board continued to exclude exculpatory evidence and to forbid John Doe from presenting witnesses on his behalf.  (Doe Aff., ¶ 43.)

At the hearing, which took place on January 16, 2019, John Doe brought witnesses to testify about the following:

> Witness 1 and Witness 2: prepared to testify that John Doe was not "falling down" drunk at the party of April 5, 2019, demonstrating Jane Roe's lack of credibility.
>
> KW: whom Goepfrich refused to interview, prepared to testify that he had witnessed Jane Roe's sexual movements in the car as well as her solicitation of John Doe to come to her dorm.
>
> FW: prepared to testify that he had witnessed Jane Roe's sexual movements in the car as well as her solicitation of John Doe to come to her dorm, evidence that Goepfrich had excluded from his judgment.
>
> JM: prepared to testify that he had witnessed Jane Roe solicit John Doe to come to her dorm and to give a timeline of Jane Roe's apparent visit to JT's dorm room door.

(Doe Aff., ¶ 42.)

24

UConn's hearing officers, Alisa Geller and John Armstrong, excluded all of John Doe's witnesses except JM.  (Id., ¶ 43.)  John Doe objected that Witness 1 and Witness 2 could provide evidence that Jane Roe consistently misrepresented the truth, which began with Jane Roe's portrayal of him as excessively intoxicated.  (Id., ¶¶ 42-43.)  Hearing officer John Armstrong retorted that there were no objections because UConn's campus court was not supposed to be a court of law or a legal process.  (Id.)  Goepfrich, who attended the hearing, also countered that Jane Roe's obvious misrepresentation that John Doe was "falling down" drunk was merely a "subjective impression," apparently immune to refutation.  (Id.)

John Doe gave a statement and was questioned aggressively by the hearing panel, especially about why he believed there was consent to touch Jane Roe sexually in the car.  (Id., ¶ 44.)  Jane Roe attended the hearing with her advisor, but she was not questioned by the hearing panel.  (Id.)  John Doe was permitted to pose questions to her through the hearing officers.  (Id., ¶ 48.)  However, no other witnesses who supported Jane Roe's allegations were required to attend, placing them beyond John Doe's ability to challenge.  (Id., 44.)

Questions John Doe posed to Jane Roe, however, revealed that she had submitted an Allegation (i.e. a written statement) to Dr. Wilena Price back in April 2019, a statement that UConn never provided it to John Doe despite the express promises made in its policies.  (Id., ¶ 49.)  When John Doe's counsel asked for the statement, the hearing officer retorted that advisors were not allowed to speak.  (Id.)  When Jane Roe stated, without any evidence, that it was the "same" as her September 2019 Allegation, the Hearing Board simply took this at face value. (Id.)  No further inquiry was made.  (Id.)  To this day, John Doe has still not received Jane Roe's original Allegation, also in violation of UConn's Title IX Policy.  (Id.)

Predictably, considering that John Doe had already been prejudged and effectively expelled on October 15, 2019, the Hearing Board affirmed Goepfrich's Judgment.  (**Exhibit M**.) The Hearing Board instructed John Doe, at approximately 6:00 p.m. on the night of December 16, 2019, after the campus was deserted for Christmas break, that he could no longer even return to his dormitory to collect his belongings.  (Doe Aff., ¶ 51.)  Barring John Doe from campus was the only new sanction imposed.  He had already been barred from enrolling for the Spring 2020 Semester.  He was informed there would be no stay of execution of the Judgment pending second-level appeal.  (**Exhibit M**.)  UConn's Title IX Policy provides no stay of sanctions pending appeal.  (Student Code, Part IV.F.1.)

John Doe submitted a second-level appeal within five business days, as UConn's Title IX Policy allows.  (Doe Aff., ¶¶ 54-58.)  On December 31, 2019, UConn sent John Doe notice that his appeal had been received.  (Id.)  Although UConn's spring semester classes begin January 21, 2020, decision on the appeal was delayed until January 15, 2020, issued by Eleanor JB Daugherty, Associate VP for Student Affairs and Dean of Students without providing written reasons for the decision.  (**Exhibit L**.)

As stated above, the second-level appeal is even more limited than the Hearing Board's extremely narrow review of the single investigator's Judgment.  At the Second Level, still within the Student Conduct bureaucracy and not before an independent decision-maker, the accused may no longer even challenge the Judgment itself, only put the procedures employed in the first-level appeal.  He is limited to attacking the Hearing Board, the sanctions, and previously unavailable evidence.  (Student Code, Part IV.F.2.)

Despite the irregularities in the Hearing Board, including the lost Allegation of Jane Roe and John Doe's excluded witnesses, Dean Daugherty again affirmed Goepfrich's Judgment

(without explaining).  (**Exhibit L**.)  She did, however, commute John Doe's expulsion to a two-year suspension.  (Id.)  The two-year suspension still stops John Doe's education that in the water.  (John Doe Aff., ¶ 58.)  What can only be considered a punitive measure, UConn even forbids John Doe from earning credits during his suspension to transfer back to UConn if he is allowed to return.  (Id.)  And his return is by no means certain.  He must reapply for admission, and even if admitted, he must apply for reinstatement in the business school in order to finish his degree.  (Id.)  He is still subject to the whim of "community standards" administrators of the university, to whom he must report for unspecified conditions to be imposed before he may return.  (**Exhibit L**.)  John Doe was only one semester away from graduation with the class of 2020 and beginning to apply for internships which are available only during students' senior year.  (Doe Aff., ¶ 59.)

In addition to the life-long damage to his career and education, there was immediate reputational harm.  Jane Roe began broadcasting to mutual friends across campus that he was a "rapist."  (Id., ¶ 52-54.)  Her friends also began a campaign to "cancel" anyone associated with him.  (Id.)  A fellow student texted one of John Doe's friends calling him a "sexual predator." (Id.)  For example, John Doe's friends have received the warning, "i can't respect sexual predators or anybody who knowingly associates with them.  as his 'friend' you should be able to hold him accountable bc he was wrong … you and the rest of y'all niggas [sic.] should have beat his ass.  he needs his ass beat…"  (**Exhibit K.**)  John Doe not only suffers reputational harm; he is now threatened with violence and racial epithets.  (Id.)

## II.   ARGUMENT

### A.  Legal Standard for TRO/PI

"In the Second Circuit, the standard for issuance of a temporary restraining order

("TRO") is the same as the standard for a preliminary injunction." *Fairfield County Medical*

*Assn. v. United Healthcare of New Eng*., 985 F. Sup. 2d 262, 270 (D. Conn. 2013).  The decision

to grant a temporary restraining order ("TRO") is consigned to the sound discretion of the district

court and reviewed for abuse of discretion. *Devlin v. Transportation Communications Intern.*

*Union*, 175 F.3d 121 (2d Cir. 1999); *Chemical Bank v. Haseotes*, 13 F.3d 569, 573 (2d Cir.

1994).

A preliminary injunction, while considered an extraordinary remedy, should issue when

necessary to preserve the status quo pending the final outcome of a case.  *Reuters Ltd v. United*

*Press International, Inc*., 903 F.2d 904, 909 (2d Cir. 1990).  The Court should grant a TRO

where John Doe can demonstrate:

1)  … [he] will be irreparably harmed in the absence of an injunction, and

2)  either (a) a likelihood of success on the merits or (b) sufficiently serious
questions going to the merits of the case to make them a fair ground for
litigation, and

3)  a balance of hardships tipping decidedly in [his] favor.

*Fairfield County Medical Assn.*, 985 F. Sup. 2d at 270 (quoting *Forest City Daly Hous., Inc. v.*

*Town of N. Hempstead*, 175 F.3d 144, 149 (2d Cir. 1999).)  See also *Benihana, Inc. v. Benihana*

*of Tokyo, LLC*, 784 F. 3d 887, 895 (2d Cir. 2015); Wright, Miller & Kane, Federal Practice and

Procedure: Civil 2d § 2951, pp. 254-55 ("When the opposing party actually receives notice of the

application for a restraining order, the procedure that is followed does not differ functionally

from that on an application for a preliminary injunction .... if there is an adversary hearing or the

order is entered for an indeterminate length of time, the 'temporary restraining order' may be treated as a preliminary injunction.").

The difference between a PI and TRO is procedural.  A TRO may be granted prior to formal notice and hearing and "should continue only for the time required to notice and hold a hearing." *DiMauro v. Pavia*, 492 F. Sup. 1051, 1064 (D. Conn. 1979) (comparing federal TRO under Fed. R. Civ. P. 65(b) to equivalent Connecticut state-law "temporary injunction").  Where, as here, John Doe can show irreparable harm and a likelihood of success on the merits, the Court should grant the TRO until ruling on his motion for a PI.  *See* Wright, Miller & Kane*, supra*; *Warner Bros. v. Dae Rim Trading Inc.*, 877 F.2d 1120, 1124 (2d Cir. 1989); *Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979).

Pursuant to Fed. R. Civ. P. 65(b)(2), John Doe is still required to give notice to the Defendants of his intention to seek a TRO, certified by his counsel.  Fed. R. Civ. P. 65(b)(2); *see also United States v. Vulpis*, 961 F.2d 368, 371 (2d Cir. 1992) (pursuant to Rule 7(b), oral notice was adequate of motion to enjoin bankruptcy filing).  Here, that notice has been satisfied.  *See* Affidavit of Michael Thad Allen, ¶¶ ##**.**

**B.  John Doe is Likely to Succeed on the Merits**

*1)  John Doe's Contract Claims against UConn Are Strong*

In Connecticut, it is well-settled law that "the basic legal relation between a student and a private university or college is contractual in nature." *Johnson v. Schmitz*, 119 F. Supp. 2d 90, 93 (D. Conn. 2000) (quoting *Ross v. Creighton University*, 957 F.2d 410 (7th Cir. 1992)) (additional citations omitted); *Doe v. Quinnipiac University*, 404 F. Supp. 3d 643, 667 (D. Conn. 2019) (same, inter alia, denying summary judgment to defendant university for breach of Title IX policies).

29

There is "no dissent from the proposition that the catalogues, bulletins, circulars, and regulations of the institution determine the contractual relationship between the student and the educational institution." *Johnson*, 119 F. Supp. 2d at 93 (internal quotations omitted).   "'[A] court that is asked to enforce an asserted 'contract' between a student and his university must examine the oral and written expressions of the parties in light of the policies and customs of the particular institution.'" *Id*. (quoting *Banerjee v. Roberts*, 641 F. Supp. 1093, 1106 (D. Conn. 1986)).

UConn's various publications, including its Student Code and its Title IX Policy, constitute the university's contracts with John Doe.  The standard for interpreting these contracts is that of "reasonable expectation"; that is, "what meaning the party making the manifestation, the university, should reasonably expect the other party to give it." *Doe v. Brandeis University*, 2016 WL 1274533 at *25 (D. Mass. Mar. 31, 2016); *Doe v. Brown University*, 2016 WL 715794 (D. R.I. Feb. 22, 2016) (same); *see also Havlik v. Johnson & Wales University*, 509 F.3d 25, 34 (1st Cir. 2007) (considering whether the "process [was] carried out in line with [the Plaintiff] student's reasonable expectations"); *Travelers Casualty & Surety Co. of America v. The Netherlands Ins. Co*., 312 Conn. 714, 740 (2014) (any ambiguity is construed in accordance with reasonable expectations of non-drafting party when that party entered into the contract).

John Doe is likely to succeed on his contract claims because UConn failed to follow specific, enforceable terms of its contractual policies: including, but not limited to

    i.     Preemptively and effectively expelling John Doe on the day of his interview with Goepfrich, October 15, 2019, by placing a hold on his transcript and blocking his enrollment in the Spring 2020 semester.

    ii.    Failure to provide notice of charges against John Doe, including "endangering behavior."

    iii.    Failure to provide the Allegations against John Doe.

30

    iv.    Withholding the Allegations to prevent John Doe from developing evidence in his own defense.

    v.    Refusing John Doe's right to submit statements from witnesses on his behalf.

    vi.    Presuming John Doe guilty prior to completing any investigation of the accusations against him.

    vii.    Failing to maintain a fair and equitable process for adjudicating accusations of sexual misconduct.

    viii.    Failing to apply the preponderance of the evidence standard.

    ix.    Failing to provide evidence that would be used against John Doe prior to any meeting or hearing.

    x.    Arbitrarily excluding exculpatory evidence.

    xi.    Failing to provide an unbiased decision maker.

    xii.    Providing no meaningful appeal.

The courts of this circuit have uniformly found against universities that wrongly suspend or expel students for "sexual misconduct" in breach of their own policies and procedures. *See Quinnipiac University*, 404 F. Sup. 3d 643, 671-672 (denying summary judgment on 29 "promises a procedural fairness and regularity" and breach of good faith and fair dealing, despite defendant university's "disclaimer" in handbook stating rules and procedures were merely "informational"); *Montague v. Yale Univ.*, No. 3:16-cv-00885 (D. Conn. Mar. 29, 2019) (denying summary judgment to university on numerous breach of contract claims and good faith and fair dealing claim, including failure to apply the preponderance of the evidence); *Doe v. Syracuse Univ.*, 2019 U.S. Dist. LEXIS 77580 (N.D.N.Y. May 8, 2019) (finding Plaintiff accused student sufficiently pled breach of contract by identifying specific policy provisions violated by University).

The Court should therefore find that John Doe is likely to succeed on the merits of his contract claims.

### 2) The Merits Favor John Doe's Due Process Claim

UConn may not deprive John Doe of his important liberty interests in continuing his education without due process. *Haughwout v. Tordenti*, Docket No. CV166032526, 2016 Conn. Super. LEXIS 2886, at *18 (Super. Nov. 17, 2016) ("A student attending a state college has a liberty interest in continuing that education") (quoting *Board of Regents v. Roth*, 408 U.S. 564, 572, 92 S. Ct. 2701, 33 L. Ed. 2d 548 (1972)). "Disciplinary actions which seriously damage a student's reputation among fellow students and teachers and which may impair future educational and employment opportunities affect a liberty interest and such actions must satisfy procedural due process." *Id.* (quoting *Goss v. Lopez*, 419 U.S. 565, 575-76, 95 S. Ct. 729, 42 L. Ed. 2d 725 (1975)). "It has long been clear that, though states have broad authority to establish and enforce codes of conduct in their educational institutions, they must 'recognize a student's legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause and which may not be taken away for misconduct without adherence to the minimum procedures required by that Clause.'" *Haidak v. Univ. of Mass.-Amherst*, 933 F.3d 56, 65 (1st Cir. 2019) (quoting *Goss v. Lopez*, 419 U.S. at 574).

To state a claim under 42 U.S.C. § 1983 for violation of his constitutional right to due process under the Fifth and Fourteenth Amendments, John Doe "must allege that he was injured by a state actor or by a private party acting under color of state law." *Phillips v. Sage Colleges*, 83 F. App'x 340, 341 (2d Cir. 2003). Here, there can be no doubt that UConn, as the flagship institution of the CSCU system, is a state actor. Defendant Student Conduct Officer Brian

Goepfrich is also a state actor as an officer of UConn's parallel campus justice system that adjudicates sexual misconduct claims.

"[A]t a minimum [due process rights] require that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Goss*, 419 U.S. at 579.  Federal and Connecticut courts have held that this includes a right to cross examination. *See Doe v. Baum*, 903 F.3d 575, 578 (6th Cir. 2018) (holding that "where a public university has to choose between competing narratives to resolve a case, the university must give the accused student or his agent an opportunity to cross-examine the accuser and adverse witnesses in the presence of a neutral fact-finder"); *Haughwout v. Tordenti,* No. CV166032526, 2016 Conn. Super. LEXIS 2886, *20 (Super. Nov. 17, 2016) ("At least in the most serious cases, the student will have a right to cross examine witnesses against him").

It is not enough to set up a single investigator, like Goepfrich, as detective, prosecutor, judge, and jury, and then merely go through the motions.  UConn cannot skew the playing field against accused students.  *See Park v. Temple University*, 757 F. App'x 102, 106 (3d Cir. 2018) ("impartial decisionmaker is a requirement of procedural due process in the school discipline setting").

Furthermore, both notice to the student and the forum in which he has an opportunity to defend himself must be ***meaningful***.  *Leng v. S. Conn. State Univ.*, Docket No. CV156053581S, 2017 Conn. Super. LEXIS 161, at *8 (Super. Jan. 18, 2017) ("Due process essentially requires the 'opportunity to be heard at a meaningful time and in a meaningful place'") (quoting *Mathews v. Eldridge,* 424 U.S. 319, 333, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976)).

Here, John Doe was effectively expelled on the day of his interview, October 15, 2019, prior to the completion of Goepfrich's so-called investigation.  No sooner was he in Goepfrich's sights than John Doe could not access his transcript or register for the Spring 2020 semester.

In ruling against John Doe, Goepfrich escalated the charges by finding John Doe "responsible" for the additional offense without notice: "endangering behavior."  This add-on charge deprived John Doe of the opportunity to develop exculpatory evidence.

In the crucial judgment phase, Goepfrich refused to accept statements form John Doe's witnesses, contrary to UConn's own rules.  Goepfrich refused to interview KW, also contrary to UConn's own rules, who had exculpatory evidence of Jane Roe's initiation of sexual activity in the car, among other things.  Only male witnesses were excluded by Goepfrich, whereas none of Jane Roe's witnesses were excluded, including her roommate, who had witnessed nothing other than a hearsay account.

Although UConn convened a Hearing Board on December 16, 2019, UConn's policies constrained the Board to an impossibly narrow review of Goepfrich's Judgment, not to evaluating the actual evidence.  UConn's Title IX Policy limits the Hearing Board's review to 1) bias, 2) whether there was "sufficient" evidence, and 3) whether there was a "rational" basis for Goepfrich's Judgment.  By this standard, the Board must affirm on any rational or sufficient ground.

On the crucial question of whether Jane Roe said "no" in the bedroom, this was a he-said/she-said case.  Under UConn's standard of review, the complainant's word will always be "sufficient" evidence.  No matter the evidence to the contrary, John Doe could never overcome Goepfrich's Judgment to "believe the woman."  UConn placed the burden on him to prove Goepfrich's "irrationality" to other (equally biased) student conduct administrators.

34

UConn's Title IX office had been directed to "ma[ke] great strides [to] include[] a trauma-informed approach to support victims and survivors." (Complaint, ¶¶ 86-87.) UConn's standard of review leaves any accused student without a meaningful hearing when faced with a single investigator's Judgment biased to "believe the [presumed] victim" and "support [the prejudged] survivor." The complainant's word, however contradictory her story might be, must always prevail under such a narrow review.

Where the accused is not given notice, prejudged before any investigation is complete, prevented from introducing exculpatory evidence, deprived of questioning the evidence and witnesses against him, and shackled to a standard of review that renders the hearing meaningless, UConn violates the constitutional due process rights of the accused.

### 3)   The Merits Favor John Doe's Title IX Claim

John Doe has three theories on which he may prevail on his Title IX claims: 1) erroneous outcome; 2) selective enforcement; and 3) retaliation. He need only show a likelihood of success or sufficiently serious questions going to the merits on one to satisfy the TRO/PI standard. *See e.g.*, *New York Path. & X-Ray Lab., Inc. v. INS*, 523 F.2d 79, 82 (2d Cir. 1975) (finding "likelihood of the appellants' success on the merits of at least one claim to justify preliminary injunctive relief" sufficient).

To succeed on an erroneous outcome claim under Title IX, John Doe must combine evidence of "a procedurally or otherwise flawed proceeding that has led to an adverse and erroneous outcome" with "particularized allegation[s] relating to a causal connection between the flawed outcome and gender bias." *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994). "[T]he claim is that the plaintiff was innocent and wrongly found to have committed an offense." *Id.*

John Doe will be able to show that UConn "adopt[ed] … a policy of bias favoring one sex over the other in a disciplinary dispute," which the Second Circuit has held amounts to sex discrimination even if "the motive for the discrimination did not come from ingrained or permanent bias against that particular sex." *Doe v. Columbia Univ*., 831 F.3d 46, 58 n.11 (2d Cir. 2016). *See also Menaker v. Hofstra University*, 935 F.3d 20 (2d Cir. 2019) (finding error where court limited *Doe v. Columbia* "to circumstances where criticism of a university had reached a 'crescendo'").

Here, not only was there a prevailing atmosphere of public criticism and student activism that put pressure on UConn to increase the prosecution of male students in the name of "believing the woman"; "supporting survivors"; and "believing the victim."  But also "supporting victims and survivors" was the official policy of UConn's Title IX Coordinator, attorney Elizabeth Conklin.

UConn's Title IX office has also championed "trauma-informed" techniques.  These were promulgated under the Obama-era Office for Civil Rights of the Department of Education as a gender-biased policy to protect women and girls.  *See Doe v. Syracuse Univ.*, Docket No. 5:18-CV-377, 2019 U.S. Dist. LEXIS 77580, at *37 (N.D.N.Y. May 8, 2019) (case to proceed on showing that goal of 'trauma-informed investigation and adjudication processes … according to the U.S. Department of Education's Office of Civil Rights … is to ensure 'the protection of girls and women'").

By publicly committed itself and its Title IX Office to "trauma-informed" techniques to protect  "survivors" and  "victims," UConn prejudges what it should determine through objective investigation based on evidence.  And prejudging the case is exactly what Goepfrich did.  John Doe was effectively expelled on the day of his first preliminary interview.

36

**C.  John Doe Will Suffer Irreparable Harm if a TRO/PI Is Not Granted**

To make a showing of irreparable harm, the moving party must establish that he is subject to a continuing harm that cannot be adequately addressed by final relief on the merits and for which money damages are inadequate. *See LaForest v. Former Clean Air Holding Co.*, 376 F.3d 48, 56 (2d Cir. 2004); *Wisdom Import Sales Co., LLC v. Labatt Brewing Co., Ltd.*, 339 F.3d 101, 113-114 (2d Cir. 2003).

Irreparable harm is often presumed in cases involving the enforcement of civil and constitutional rights.  *See, e.g. Doe v. Rector & Visitors*, Civil Action No. 3:19CV00038, 2019 U.S. Dist. LEXIS 108990, at *18 (W.D. Va. June 28, 2019) ("courts have recognized that when constitutional rights are being threatened or impaired, irreparable injury is presumed"); *Able v. United States*, 847 F. Supp. 1038, 1043 (E.D.N.Y. 1994) ("[P]ossible violation of constitutional rights [under Fifth and First Amendments] constitutes irreparable harm."); *Vietnamese Fishermen's Ass'n v. Knights of the Ku Klux Klan*, 543 F. Supp. 198, 218 (S.D. Tex. 1982) ("Victims of discrimination suffer irreparable injury, regardless of pecuniary damage."); *Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1424 (11th Cir. 1984) (housing discrimination "almost always results in irreparable injury").

Here, John Doe was effectively expelled the day he walked into his interview with Goepfrich.  UConn went through the motions, capped by the meaningless Hearing Board which threw him off campus the night of the hearing (December 16, 2019).  John Doe is now barred from completing his degree with the class of 2020 with uncertain prospects of return.  He faces all the damage to his future that this entails.  The commutation of his expulsion to a two-year suspension, without guarantee of return, does little to reduce that harm.

This was what the court decided in *King v. Depauw University,* No. 2:14-cv-70-WTL-DKL, 2014 U.S. Dist. LEXIS 117075, at *39-40 (S.D. Ind. Aug. 22, 2014).  There, a campus court decided to expel the accused student while breaching its policies.  Among other errors, as here, the investigator made "no attempt to … ferret out other students who might have additional information."  Id. at *37.  The university's Dean of Student Affairs, as here, commuted a judgment of expulsion to fewer than two-semester's suspension.  Id. at *24.  Notwithstanding this less draconian sanction -- far less than the two-year suspension and uncertain reapplication process faced by John Doe -- the court granted a preliminary injunction.  As to irreparable harm, the court found:

> [plaintiff] will forever have either a gap or a senior-year transfer on his record. The Court finds it inevitable that he would be asked to explain either situation by future employers or graduate school admissions committees, which would require him to reveal that he was found guilty of sexual misconduct by DePauw. Successfully seeing this lawsuit to its conclusion could not erase the gap or the transfer; the question will still be raised, and any explanation is unlikely to fully erase the stigma associated with such a finding. Money damages would not provide an adequate remedy at that point; DePauw's disciplinary finding—even if determined to have been arbitrary or made in bad faith—would continue to affect him in a very concrete way, likely for years to come.

Id. at * 39-40.  *See also Doe v. Rector & Visitors*, 2019 U.S. Dist. LEXIS 108990 at *18 (finding irreparable harm due to "penalty that could drastically curtail future educational and employment opportunities"); *Doe v. Univ. of Mich.*, 325 F. Supp. 3d 821, 826 (E.D. Mich. 2018) (granting PI prospectively prior to expulsion where plaintiff may "presently be without sufficient due process protections" and "at immediate risk of expulsion [and] [m]oreover, ha[d] already suffered injury - sexual assault allegations may impugn his reputation and integrity, thus implicating a protected liberty interest"); *Ritter v. Oklahoma*, No. 5:16-cv-00438, 2016 U.S. Dist. LEXIS 60193, at *8 (W.D. Okla. May 6, 2016) (concluding there was irreparable harm because the "loss of

educational and career opportunities [plaintiff] will encounter if not reinstated and allowed to graduate is not readily compensable in money damages").

John Doe has also suffered reputational harm.  Not only has UConn's Title IX Office labeled him a sex offender, Jane Roe and her friends are now urging others to "beat his ass." Even if he had not been expelled, the damage done to his reputation is extreme and suffices for a preliminary injunction.  *See Doe v. Baum*, No. 16-13174, 2019 U.S. Dist. LEXIS 169625, at *41 (E.D. Mich. Sep. 30, 2019) ("risk to the plaintiff's reputation due to prospective disclosure of the wrongfully imposed disciplinary sanctions readily suggests a prospect of irreparable harm").

John Doe therefore satisfies the irreparable harm problem for a TRO/PI.

### D.  Defendants Suffer No Harm if the TRO/PI Is Granted and the Public Interest Favors John Doe's Motion

In contrast to the direct and immediate harm to John Doe, UConn can scarcely argue that it will suffer any harm at all.  From April to September 2019, John Doe and Jane Roe coexisted on campus without incident despite Jane Roe's first Allegation in April.  John Doe and Jane Roe worked in the same African American Cultural Center.  Although UConn's Title IX Policy provides for "interim measures" such as stayaway orders/no contact orders or other measures to protect the safety of students, UConn imposed no interim measures following Jane Roe's first Allegation.  There is no evidence that any harm resulted from its failure to do so.

The public interest also favors granting a TRO/PI.  Courts have overwhelmingly found that the public interest favors universities being held to account for breaking their own policies and illegally disciplining students.  *See e.g.*, *Rector & Visitors*, 2019 U.S. Dist. LEXIS 108990, at *19 ("injunction protecting the plaintiff's right to due process is in the public interest); *Doe v. Univ. of Mich.*, 325 F. Supp. 3d at 829 (protecting a person's right to due process is "always in

the public interest"); *Ritter*, 2016 U.S. Dist. LEXIS 60193, at *8 (noting that "it is always in the

public's interest that a student be treated fairly before being disciplined").

### E.   The Court Should Waive the Bond Requirement under Fed. R. Civ. P. 65(c)

This Court should waive the requirement that Plaintiff post a security bond under Fed. R.

Civ. P. 65(c).[8]  John Doe's Motion satisfies the exception which allows the Court to waive the

bond where the injunction raises no risk of monetary loss to the defendant.  *Tilden Rec. Vehicles,*

*Inc. v. Belair*, 786 F. App'x 335, 2019 U.S. App. LEXIS 26844, at *16 (3d Cir. 2019).  On

specific findings that support the Court's conclusion, the Court "may dispense with the posting

of security entirely where the parties sought to be enjoined or restrained 'have not shown that

they will likely suffer harm absent the posting of a bond.'"  *Cosgrove v. Board of Education*, 175

F. Sup. 2d 375, 399 (N.D.N.Y. 2001) (quoting *Doctor's Associates, Inc. v. Stuart*, 85 F.3d 975,

985 (2d Cir. 1996).  Furthermore, the important public policy interests at stake in the compliance

of educational institutions with statutory requirements justify waving the injunction bond.

*Cosgrove v. Board of Education*, 175 F. Sup. 2d at 398.

Here, John Doe is merely asking to complete the degree for which he was already paying

and studying for.  The public interest lies in UConn's compliance with federal and state civil-

rights law, the Constitution, and its own rules.  Finally, UConn cannot demonstrate harm.  John

Doe and Jane Roe coexisted without incident for an entire semester prior to Jane Roe filing her

second sexual misconduct complaint.  Therefore, the Court should waive the requirement of an

injunction bond under Fed. R. Civ. P. 65(c).

---

[8] "The court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c)

**III.   CONCLUSION**

For the foregoing reasons, the Court should grant Emergency Motion for Temporary Restraining Order and Preliminary Injunction and enter a Temporary Restraining Order requiring Defendants University of Connecticut and Brian Goepfrich to allow John Doe's immediate enrollment to rejoin the Class of 2020 and enjoin Defendants' interference with John Doe's studies.

The Court should also order a full hearing on John Doe's Motion for Preliminary Injunction.

                                              Respectfully submitted,


                                              Michael Thad Allen, Esq. (ct29813)
                                              ALLEN LAW, LLC
                                              PO Box 404
                                              Quaker Hill, CT  06375
                                              (860) 772-4738
                                              m.allen@allen-lawfirm.com

                                              for PLAINTIFF

**CERTIFICATE OF SERVICE**

I hereby certify that on the date specified in the caption of this document, I electronically filed the foregoing with the Clerk of Court, to be served on all parties of record via the CM/ECF system and by email on the following parties:

Attorney Nicole Gelston
General Counsel
University of Connecticut
Office of the General Counsel
343 Mansfield Road, Unit 1177
Storrs, CT 06269-1177

William Tong
Attorney General

Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
Attorney.General@ct.gov

Michael Thad Allen