UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| JOHN DOE,<br>             PLAINTIFF<br><br>vs.<br><br>UNIVERSITY OF CONNECTIUCT<br>AND BRIAN GOEPFRICH,<br>             DEFENDANTS. | Civil Case No. 3:20-cv-00092 |

**AFFIDAVIT OF** Redacted
<u>**UNDER SEAL**</u>
**IN SUPPORT OF MOTION FOR TRO AND PRELIMINARY INJUNCTION**

My name is Redacted and I am over 18 years of age. I understand the meaning of an oath and swear that the following statements are true upon my oath:

**I.   BACKGROUND**

1. I am the Plaintiff, proceeding anonymously in the above-captioned case. I make all the statements in this Affidavit based on my direct experience and knowledge.

2. I am an African-American male, the child of Jamaican immigrants who came to this country seeking better opportunities for themselves and their children, including through America's first-rate universities, its dynamic economy, and its fair justice system. Until recently, I was enrolled, with an unblemished record, at Defendant University of Connecticut ("UConn"). I worked at UConn's African American Cultural Center and maintained a 3.5 GPA. I enrolled in UConn in Fall 2016, and in the fall of 2019, I had only one semester to go before graduating. I am majoring in Management Information Systems in the UConn business school. I had dreams of working as a forensic specialist or in cybersecurity after my graduation.

3. I have never had any disciplinary issues in high school or in college. I have never even been arrested, not once. Both my parents value education and made sure I stayed out of trouble and took school seriously.

4. On or around September 20, 2019, I was notified by Defendant Brian Goepfrich that I had been accused of a Student Conduct Code violation. I attach a true copy of this letter as **Exhibit A**.

5. I learned that I was being falsely accused of "non-consensual sexual contact and nonconsensual sexual intercourse" by a female UConn student, referred to in court documents as "Jane Roe." Had I been able to adequately defend myself in a fair and unbiased disciplinary hearing, the evidence shows that my sexual encounter with Jane Roe was entirely consensual.

6. Instead, UConn held a proceeding in which Defendant Goepfrich ignored and excluded critical evidence of my innocence. My key witnesses were prevented from testifying. In the end, I was found responsible and suspended for two years without guarantee that I can return even then. I must reapply to UConn, and even if I'm admitted, I still have to reapply to the business school to complete my degree.

7. My life as I know it ended that day. With a finding of responsibility for a sex crime and a two-year gap in my educational record – after which time I have no guarantee of getting back into UConn – my educational and career prospects are forever changed.

## II. THE CONSENSUAL SEXUAL ENCOUNTER WITH JANE ROE

8. On the evening of April 5, 2019, I attended an off-campus party with my roommate, who is referred to as "FW" in the Complaint. Two other friends from another university, "KW" and "JM," came with us as well.

9. Before going to the party at approximately 10:00 pm, FW and I shared some Captain Morgan Long Island Iced Tea at a pre-party. I had three shots. This is a premixed drink with only a 17% alcohol content. It was the only alcohol I consumed that evening.

10. As the party wound down around 1:00 in the morning, Jane Roe (who I worked with at the AACC) and her friend, referred to in the complaint as "JT," approached me and my friend JM. Jane Roe was interested in me. About a week before, Jane Roe had told me by text message that JT was interested in me, but now JT was interested in my friend JM. Jane Roe and JT ignored the other guys in our group, FW and KW.

11. All six of us (that's Jane Roe, myself, JT, JM, KW, and FW) left the party in JM's car. JM drove us to Blaze Pizza to get something to eat. Four of us (Jane Roe, myself, JT, and FW) squeezed into the backseat. KW sat in the passenger seat. Although there was room for all four of us to squeeze into the backseat side-by-side (JM has a Nissan Altima, a full-size sedan), Jane Roe climbed into my lap. I did not ask her to sit in my lap. I didn't force her to sit in my lap. That was her choice.

12. During the ride to the pizzeria, Jane Roe began to gyrate in a kind of lap dance, grinding herself on my penis. Her knees were pressing into the front seat where KW was sitting as she made these grinding motions. After she started doing this, I reached around and fingered her vagina. She made moaning sounds. It seemed to me like she was enthusiastic and actively participating in this behavior.

13. After getting some pizza, we next stopped at the Nathan Hale Inn, which UConn uses for student housing and where FW and I shared a room. At this point, I intended to go inside and go to bed, alone. However, Jane Roe and JT called out to me to get back in the car, join them, and come back to their dorm, called West. My roommate FW left the group, but I got back in the car with Jane Roe because she invited me to her dorm.

14. JM then parked near West dormitory, and Jane Roe led me to their dorm. JT was with JM. No one suggested we all hang out together -- we knew we were going to separate rooms, and KW was left in the car alone.

15. Shortly after arriving at Jane Roe's room, about 15 minutes, she asked me to sit down on her bed. I first sat with my back to the wall across the bed toward the foot of the bed. She lifted her legs and put them over my lap. I started rubbing her legs.

16. I then started to pull down Jane Roe's pants. She asked, "Do you have a condom?" She later said that not having a condom was an excuse she made up to avoid sex, but I don't understand how she could say that. I had a condom. I took off my pants and retrieved the condom, and when I turned back to the bed after putting the condom on, Jane Roe had voluntarily removed her own underwear.

17. Jane Roe and I started to have sex. The sex lasted about 15 minutes. We spent about 5 minutes in each of three different positions. In the second position, Jane Roe got on top of me, and she guided my penis into her vagina. In the third position she was holding herself on her hands and knees in "doggie style" and looking back at me. She was active throughout the sex and knew what she wanted.

18. After sex, I recall that Jane Roe left the bedroom to clean herself up. This was about 30 minutes after Jane Roe and I were first alone in her room. I thought everything was fine. We sat on her bed watching TV, and she was caressing my hair. After about another 30 minutes JM returned, and he and I left. When we said goodbye, JT and Jane Roe were giggling together in Jane Roe's room.

**III.   JANE ROE'S ACCUSATION**

19.   Six days after our sexual encounter, I began to receive accusatory text messages from Jane Doe.

20.   **Exhibit B** is the record of my disciplinary file, includes the full record of our text message. (**Ex. B** at JD00033-38, "Text Messages.")

21.   In her texts, Jane Roe bombarded me with accusations that she had said "no" and "stop" before and during our sexual encounter. (*Id*. at 35-36.) I immediately said this was not true, and my text messages reflect my genuine confusion: "I'm so sorry Omfg  No way you actually said that  Because I would've known  And you told me to put on a condom  I'm so confused" (*Id*. at 35.)

22.   Jane Roe claimed that she had made many "excuses" not to have sex, "One of which was you not having a condom." (*Id*. at 35.) But I obviously had a condom and we practiced safe sex. Jane Roe also claimed, "I NEVER said for you to come to west [her dormitory]." (*Id*. at 35.) This was also not true, as both KW and JM, who were in the car with us that night, have confirmed.

**IV.   THE UNFAIR DISCIPLINARY PROCESS**

23.   On September 20, 2019, I received a letter from Brian Goepfrich notifying me that I was accused of "alleged … non-consensual sexual contact and nonconsensual sexual intercourse." (**Exhibit A**.)

24.   UConn never provided me with the Allegations that Jane Roe submitted that September to start the complaint. I capitalize it as "Allegations" because that is how it is defined in UConn's Student Code.

25. Because I did not receive the Allegations, I was not aware that Jane Roe claimed to have fled her bedroom before we had sex or that she had visited JT to ask her permission to have sex with me (JT had previously expressed her own interest in me to Jane Roe). I was not aware of Jane Roe's emphasis on talking to JT even at the interview Goepfrich called me to on October 15, 2019. This prevented me from submitting evidence to address this issue. It was also against UConn's Student Code.

26. I asked Goepfrich for the evidence that would be considered and used against me in any meeting and hearing in emails of September 28, 2019 and twice on October 10, 2019. He refused. I attach a true copy of this correspondence as **Exhibit C**. At no point was I allowed to question any of the witnesses against me; I was not even allowed to know who Goepfrich was interviewing as witnesses against me during the investigation process while Geopfrich decided his Judgment.

27. I read UConn's Responsibilities of Student Life: The Student Code ("Student Code"), which says the "respondent … may … provide witness statements and any documentation that may be relevant to the facts of the incident." (Student Code, § IV(B)(2).) I attach as **Exhibit E** a true copy of the Student Code. To defend myself, I got statements from my roommate FW and my friend JM. Those statements demonstrate my innocence.

28. I attach as **Exhibit F** a true copy of the email I sent to Goepfrich, giving him the statements I was able to get from JM and FW. I received no response. I learned only at my first meeting with Goepfrich on October 15, 2019 that he would not accept the statements. Goepfrich's notes of that meeting are attached. (*See* **Exhibit B** at JD00040-43). Goepfrich insisted that he could only consider witness testimony if the witnesses individually contacted him to submit to his interview. This is not what UConn's policy says.

29.     When I checked my official UConn transcript and attempted to register for Spring 2020 Semester, I learned that UConn had already placed a hold on my transcript and blocked my enrollment in spring semester on that very day, October 15, 2019.

30.     I attach a true copy of UConn's registration portal as accessed on December 16, 2019 as **Exhibit G**. It clearly says "Hold for Administrative Reason"; Start Date 10/15/2019. (Id. at 2.) It says I am not permitted to enroll. (Id.) On the day of my first interview, October 15, 2019, I was already effectively kicked out of the university.

31.     Goepfrich issued a written decision on November 14, 2019, a true copy of which I attach as **Exhibit D** (the "Judgment"). I have given page numbers to this document in the form JD#### because the page numbering in the document is not consistent.

32.     In his Judgment, Goepfrich not only found me responsible for sexual assault, but also for "endangering behavior" – a charge I had never been notified that he was considering.

33.     I did not receive a copy of Jane Roe's second set of Allegations against me until after Goepfrich issued his Judgment.

V.    FIRST LEVEL APPEAL IN THE HEARING BOARD PROCESS

34.     Goepfrich did not stop arbitrarily changing UConn's rules after he issued his Judgment. When he sent me his Judgment, Goepfrich requested that I "email [him] within ***four business days*** (5:00 PM, Tuesday, November 19, 2019, November 19, 2019 [sic.]) to inform me of the resolution process you would like this case to be resolved by way of" (emphasis added). A true copy of this letter is attached to Goepfrich's Judgment, **Exhibit D** at 1.

35.     Again, Goepfrich showed his unfairness by counting business days wrong and shortening the amount of time for me to respond. Four business days from November 14, 2019

7

fell on November 20, 2019.  Yet when I asked for the full four days, Goepfrich arbitrarily denied me the additional day.

36. A true copy of our email correspondence from November 14 to November 20, 2019 is attached here as **Exhibit H**.  When I asked Goepfrich to say what rule for counting business days or what policy Goepfrich relied upon, Goepfrich refused to explain.  (*Id*.)  He just insisted that I answer him one day early.  (*Id*.)

37. My only option, short of admitting responsibility and acquiescing to Goepfrich's Judgment to expel me, was to request an Administrative Hearing under UConn's Student Code, **Exhibit E**, Part IV.

38. Goepfrich first scheduled the Hearing Board to convene on December 4, 2019, the Monday after Thanksgiving break.  Goepfrich directed me to submit a list of witnesses, a summary of their expected testimony, and any statement or additional evidence I wished to present by 9:00 a.m. December 2, 2019.  I attach a true copy of this communication as **Exhibit I**.

39. This was extremely difficult.  The deadline fell at 9:00 a.m. on the Monday morning after Thanksgiving break.  I had to round up all of my witnesses and compose my statement during a time in which it is almost impossible to reach anyone on a college campus due to the holiday.  JM and KW are also students of another university, and it had been so hard for me to reach them that I was never able to get a statement from KW in time to submit before Goepfrich's Judgment.  After Goepfrich refused to interview KW, I wanted to make sure I had a statement from KW for the hearing.

40. I asked the Hearing Board to give me more time.  But UConn did not respond until *after* the 9:00 a.m. December 2, 2019 deadline.  By then I had already rushed to submit a packet of materials.

41. A true copy of the letter extending the hearing until December 16, 2019 is attached as **Exhibit J**. This was also in the middle of finals week, placing me under extreme pressure.

42. At the hearing of December 16, 2019, I brought five witnesses to testify about the following things:

> Witness 1 and Witness 2: prepared to testify that I was not "falling down" drunk at the party of April 5, 2019 and demonstrating Jane Roe's lack of credibility.
>
> KW: whom Goepfrich had refused to interview and excluded from the Judgment, prepared to testify that he had witnessed Jane Roe's sexual movements in the car as well as her invitation to me to come to her dorm.
>
> FW: whose statement Goepfrich excluded, prepared to testify that he had witnessed Jane Roe's sexual movements in the car and her invitation to me to come to her dorm, evidence that Goepfrich excluded from his Judgment.
>
> JM: prepared to testify that he witnessed Jane Roe invite me to come to her dorm, which Goepfrich had excluded from his Judgment, and to give a timeline of Jane Roe's apparent visit to JT's door.

43. UConn's hearing officers, Alisa Geller and John Armstrong, refused to let any of these witnesses testify except JM. When I objected that Witness 1 and Witness 2 could provide evidence that Jane Roe misrepresented the truth, which began with her saying I was falling down drunk, John Armstrong told me harshly that UConn's campus court was not supposed to be a court of law and was not run by legal process. Goepfrich, who was also there, said that Jane Roe's obvious misrepresentation that I was "falling down" drunk was merely a "subjective impression," which I guess he means to say is completely beyond refuting.

44. I gave a statement to the Hearing Board, and both officers asked me questions, including about whether I had consent to touch Jane Roe in the car, even though she admitted this was consensual and I had explained that she initiated sexual touching in the car. Goepfrich had eliminated the evidence from my witnesses who had seen this in the car. Now the Hearing

9

Board refused to hear them too.  After aggressively questioning me, the Hearing Board did not question Jane Roe at all.  Jane Roe brought no witnesses to support her story.  So obviously the Hearing Board did not question them, and I had no chance to question them at any time.

45. JM was the only one of my witnesses allowed to testify.  He told the hearing officers that what he remembered about the timeline of events was the same as mine.

46. He remembered that someone came to JT's door right before he and JT began having sex.  This was about half an hour before he left her room.  This placed Jane Roe's visit to JT's door roughly 30 minutes after we had split up as couples.  This would have been after Jane Roe and I had sex but before JM and JT had sex.

47. JM also told the Hearing Board there was not a single sign of alarm when JT came back to him from speaking with Jane Roe.  There was no sign she was concerned that her friend might be sexually assaulted.

48. I was permitted to pose questions to Jane Roe through the Hearing Officers.  But no other witnesses who had supported Jane Roe's allegations were required to attend.  I was never allowed to question them in any way.

49. During questions posed to Jane Roe, she said she had submitted an Allegation (i.e. a written statement) to Dr. Wilena Price back in April 2019.  I asked for the statement.  UConn never provided it to me.  When my advisor, attorney Michael Allen, asked for the statement, the hearing officers warned him that he was not allowed to speak and could be thrown out of the meeting.  Then Jane Roe said that her April Allegation was the "same."  The Hearing Board simply chose to believe her without finding the statement.  To this day, I have still not received Jane Roe's original Allegation.

50. Despite Jane Roe's April Allegation, UConn took no action at that time. My working relationship with Jane Roe at the AACC did not change. UConn did not tell me I had to stay away from her. There was no incident or conflict between us to my knowledge.

51. The Hearing Board instructed me, at approximately 6:00 p.m. on the night of December 16, 2019, after the campus was deserted for Christmas break, that I could no longer even return to my dorm to collect my things. They simply affirmed Goepfrich's Judgment.

VI. **MY REPUTATION IS IMMEDIATELY ATTACKED**

52. No sooner was I thrown off campus than Jane Roe began broadcasting to mutual friends across campus that I am a "rapist." Her friends also began a campaign to "cancel" anyone associated with me. One student texted people calling me a "sexual predator."

53. I attach a true copy of one such text message as **Exhibit K**.

54. My friends have received the warning, "i can't respect sexual predators or anybody who knowingly associates with them. … you and the rest of y'all niggas [sic.] should have beat his ass. he needs his ass beat…" (Id.) I am now threatened with violence and racial epithets.

VII. **THE SECOND LEVEL APPEAL**

55. I submitted a second appeal within five business days, according to UConn's Title IX Policy and Student Code.

56. On December 31, 2019, UConn sent me notice that my appeal had been received. After that I heard nothing for over two weeks.

57. UConn classes for Spring 2020 Semester begin January 21, 2020.

58.     On January 15, 2019, I received a letter from Eleanor JB Daugherty, Associate VP for Student Affairs and Dean of Students answering my second level appeal. I attach a true copy of this letter as **Exhibit L**.

59.     Although my appeal was granted to the limited extent that my expulsion was converted into a two-year suspension, this two-year suspension stops my education dead in the water. I am forbidden to even earn credits to transfer back to UConn if I could eventually return, and UConn does not even guarantee that I will be readmitted. Even if I were readmitted to the University, I still have to apply again to the School of Business to complete my degree.

60.     I was one semester away from graduating. I was beginning to apply for internships which are available only during your senior year. UConn's actions against me have kept me from applying to internships, let alone my first post-college job which I planned to take after graduating in spring 2020.

61.     If Goepfrich's Judgment and UConn's sanction are left to stand, my educational and career opportunities will be forever damaged. I will have to disclose my sanction for a sex offense to any future institution of higher education to which I apply. This places an added burden on me, as a young African-American man from an immigrant family. It erases all my hard work, it erases my good grades, it erases the fact that I have no prior disciplinary record, and it erases the fact that I have no criminal background.

62.     Attached as **Exhibit M** is a true copy of the Hearing Board decision on my first-level appeal, dated December 17, 2019.

63.     Attached as **Exhibit N** is a true copy of an affidavit executed by witness KW.

64.     Attached as **Exhibit O** is a true copy of the University of Connecticut Policy Against discrimination, Harassment, and Related Interpersonal Violence ("Title IX Policy").

64. Attached as **Exhibit P** is a true copy of the University of Connecticut policy, titled Sexual Misconduct Cases Involving a Student Respondent.

**SIGNED UNDER THE PENALTIES OF PERJURY THIS 18TH DAY OF JANUARY 2020**

Redacted

Subscribed and sworn to before me
this 18th Day of January 2020 by

*/s/ Michael T. Allen/*

Michael Thad Allen
Commissioner of the Court
D.Conn. Bar No. ct29813