## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

JOHN DOE,

      Plaintiff,

      v.

UNIVERSITY OF CONNECTICUT,
GREGORY BOUQUOT, MICHAEL GILBERT,
and BRIAN GOEPFRICH,

      Defendants.

No. 3:20cv92 (MPS)

January 23, 2020

## TEMPORARY RESTRAINING ORDER

This case challenges the fairness of disciplinary proceedings brought against Plaintiff John Doe[1] by the University of Connecticut ("UCONN") for alleged sexual assault, culminating in the Plaintiff's two-year suspension from the University. On January 20, 2020, the Plaintiff filed an "Emergency Motion for Temporary Restrain[ing] Order and Preliminary Injunction," asking the Court to allow him to "rejoin the class of 2020" and register for Spring classes. ECF No. 2 at 1, 3. The Court heard argument on the motion at 10:00 AM on January 23, 2020. As set forth herein, the Court grants the Plaintiff's motion for a Temporary Restraining Order.

## I.     LEGAL STANDARD

"In the Second Circuit, the standard for issuance of a temporary restraining order ("TRO") is the same as the standard for a preliminary injunction." *Fairfield Cty. Med. Ass'n v.*

---

[1] The Plaintiff filed a motion for leave to proceed under the pseudonym "John Doe," since his claims relate to allegations of sexual misconduct against him and since his claims involve his educational records. ECF No. 3. He also filed a motion to seal a number of exhibits, including his affidavit. ECF No. 4. While the Defendants have not yet responded to, and I have not yet decided, either motion, I will use pseudonyms for the purpose of this ruling and will not disclose the confidential contents of any sealed exhibits.

*United Healthcare of New England*, 985 F. Supp. 2d 262, 270 (D. Conn. 2013), *aff'd as modified sub nom. Fairfield Cty. Med. Ass'n v. United Healthcare of New England, Inc.*, 557 F. App'x 53 (2d Cir. 2014). Typically, "district courts may grant a preliminary injunction where a plaintiff demonstrates irreparable harm and meets either of two standards: (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of hardships tipping decidedly in the movant's favor." *Trump v. Deutsche Bank AG*, 943 F.3d 627, 635 (2d Cir. 2019), *cert. granted*, No. 19-760, 2019 WL 6797733 (U.S. Dec. 13, 2019). In *Winter v. Natural Resources Defense Council, Inc.*, the Supreme Court formulated the preliminary injunction standard slightly differently, requiring plaintiffs to "establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." 555 U.S. 7, 20 (2008). I will address these elements in addition to the elements required in *Trump v. Deutsche Bank*.

A heightened standard applies, however, when a plaintiff seeks a "mandatory injunction," which alters the status quo. *N. Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018). The status quo is "the last actual, peaceable uncontested status which preceded the pending controversy." *Id.* at 37 & n.5. When seeking a mandatory injunction, a plaintiff must show "a clear or substantial likelihood of success on the merits," in addition to the showing of irreparable harm. *N. Am. Soccer League*, 883 F.3d at 37.[2]

---

[2] In a more recent case, the Second Circuit noted that a plaintiff could also "perhaps" prevail under the heightened standard upon a showing that "the balance of hardships tips even more decidedly in their favor because extreme or very serious damage will result from a denial of preliminary relief." *H'Sh aka v. O'Gorman*, 758 F. App'x 196, 198 (2d Cir. 2019) (summary order); *see also Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985) (noting that a mandatory injunction "should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result form a denial of preliminary relief"). I need

Here, the Plaintiff was expelled from UCONN on December 17, 2020, ECF No. 10-10 at 1, and his sanctions were adjusted on January 15, 2020 to require a two-year suspension, ECF No. 10-9 at 1. Before he filed this lawsuit, the Plaintiff had been suspended as a student at UCONN and was not permitted to register for Spring 2020 classes. Therefore, his request to enroll in the Spring semester and "rejoin the class of 2020" seeks to alter the status quo and requires a heightened showing.

## II.     DISCUSSION

### A. Irreparable Harm

Based on the facts alleged in the complaint, the Plaintiff's affidavit, and the documents submitted in support of the motion, it is clear that the Plaintiff will suffer irreparable harm if he cannot enroll in UCONN this semester.  The January 15, 2020 letter from UCONN to the Plaintiff states that his suspension is "effective from December 16, 2019 through January 1, 2022." ECF No. 10-9 at 1. Though he may apply for readmission in 2022, his "[r]eadmission to the University is not guaranteed" and "reacceptance into your school or college is at the discretion of the school or college." *Id.* In addition, "[a] notation of Suspension shall be placed on [his] official transcript until graduation" and "[t]he University of Connecticut will not accept credits earned at another institution during a period of suspension." *Id.*

In his affidavit, the Plaintiff explains that he was "majoring in Management Information Systems in the UConn business school" and "had only one semester to go before graduating." Doe Aff., ECF No. 2-3 ¶ 2. He was in good academic standing, with a 3.5 GPA and an unblemished record, and he held a job on campus. *Id.* After the suspension, even if he is

---

not decide whether a mandatory injunction could issue without a showing of clear likelihood of success on the merits because I find that the Plaintiff has made such a showing.

readmitted to UCONN, he would "still have to reapply to the business school to complete [his] degree." *Id.* ¶ 6. He avers that "[w]ith a finding of responsibility for a sex crime and a two-year gap in [his] educational record . . . [his] educational and career prospects are forever changed." *Id.* ¶ 7. Because UCONN "will not accept credits earned at another institution during a period of suspension," "this two-year suspension stops [his] education dead in the water" and guarantees that he will have a two-year gap in his education. *Id.* ¶ 59. He would have to explain that gap— and his sanction for a sex offense—to any educational institutions or jobs he applies for in the future. *Id.* ¶ 61. He states that he was "beginning to apply for internships which are available only during your senior year," and that "UConn's actions against [him] have kept [him] from applying to internships, let alone [his] first post-college job[,] which [he] planned to take after graduating in spring 2020." *Id.* ¶ 60.

For a college student poised to graduate in a few months, it is highly likely that a two-year suspension and a sanction for sexual assault would indeed "forever change[]" the trajectory of his education and career. If he is not permitted to enroll in the Spring 2020 semester, he would need to explain a gap on his résumé in future applications to schools or jobs. He would also need to explain the suspension notation on his UCONN transcript, and a truthful explanation would seriously hinder his prospects. During the January 23, 2020 telephonic status conference, counsel for the defendants did not offer any argument that the harm imposed by a two-year suspension would not be irreparable. I find, therefore, that the Plaintiff has demonstrated irreparable harm.

**B.  Clear Likelihood of Success on the Merits**

The Plaintiff alleges, among other claims, that UCONN's disciplinary proceedings violated his right to due process under the Fourteenth Amendment. On the record before the

Court, the Plaintiff has met the heightened requirement for a mandatory injunction and has shown a clear likelihood of success on his due process claim.[3]

The Due Process Clause "forbids arbitrary deprivations of liberty," such that "[w]here a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him, the minimal requirements of the Clause must be satisfied." *Goss v. Lopez*, 419 U.S. 565, 574 (1975) (internal quotation marks omitted). The Due Process Clause applies where "charges of misconduct" by school authorities and a suspension "could seriously damage the students' standing with their fellow pupils and their teachers as well as interfere with later opportunities for higher education and employment." *Id.* at 574–75. Here, the two-year suspension for sexual assault changed the Plaintiff's legal status since he could no longer be a student, put his reputation at stake, and seriously damaged his career prospects; he is thus entitled to procedural protections under the Due Process Clause. *See Doe v. Purdue Univ.*, 928 F.3d 652, 663 (7th Cir. 2019) (finding that plaintiff who was suspended for one year after University found him guilty of sexual violence had adequately alleged a liberty interest under the "stigma plus" test because he alleged reputational harm, a change to his legal status due to the suspension, and seriously diminished employment prospects).

On the question of "what process is due," *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972), the law is highly fact-specific. "The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S.

---

[3] Although the Plaintiff has sued UCONN, a party over which the Court may not exercise jurisdiction under the Eleventh Amendment, *Brown v. Western Connecticut State Univ.*, 204 F. Supp. 2d 355, 361 (D. Conn. 2002) ("Connecticut state universities are entitled to claim immunity under the Eleventh Amendment analysis."), the Plaintiff has also named three University officials in their official capacities. *See* Am. Compl., ECF No. 15. The Court has jurisdiction over claims for prospective relief against state officials alleging ongoing violations of federal law, as the due process claim does in this case. *Dube v. State Univ. of New York*, 900 F.2d 587, 595 (2d Cir. 1990).

319, 333 (1976) (internal quotation marks and citation omitted). A court must consider three factors in determining whether due process has been satisfied: "[f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 335.

The Plaintiff was accused of "non-consensual sexual contact and nonconsensual sexual intercourse" with a fellow UCONN student ("Jane Roe") in Jane Roe's dorm room on the evening of April 5, 2019. Doe Aff., ECF No. 2-3 ¶ 23. UCONN ultimately found that he did "engage[] in non-consensual sexual contact as well as . . . non-consensual intercourse with [Jane Roe] in [Roe's] Residence Hall room." ECF No. 10-10 at 1. The Plaintiff does not dispute that he had sexual intercourse with Jane Roe on that night, but he argues that all sexual activity between them was consensual. Doe Aff., ECF No. 2-3 ¶¶ 16–17. Because the Plaintiff and Jane Roe were the only two in the dorm room during the incident, UCONN's finding of non-consent necessarily hinged on the credibility of both the Plaintiff and Jane Roe.

Despite the importance of credibility to the factual dispute, UCONN's disciplinary procedures hampered the Plaintiff's ability to present a meaningful defense on this issue. First, the Plaintiff avers in his affidavit that the hearing officers at his December 16, 2019 administrative hearing refused to hear testimony from four of the five witnesses the Plaintiff attempted to present. Doe Aff., ECF No. 2-3 ¶¶ 42–43. The evidence the Plaintiff has submitted indicates that his witnesses were prepared to offer testimony that would tend to undermine Jane Roe's credibility. Specifically, two witnesses were prepared to testify that Jane Roe had initiated

"sexual movements" on the Plaintiff's lap in the car on the night of April 5, 2019. *Id.* ¶ 42; ECF No. 10-5 at 5 (statement by witness "FW" that "the girl sitting on [Plaintiff's] lap was moving like she was dancing on his lap, moving her body like moving from her waist. I didn't want to stare at them."); ECF No. 10-11 (statement by witness "KW" that "I could also feel the knees of the girl sitting on [Plaintiff's] lap through the back of my seat. I could feel that she was moving back and forth. It was clear to me that these movements on [Plaintiff's] lap were sexual. She was not just bumping my seat randomly."). This is significant because Jane Roe specifically denied initiating any sexual movement on the Plaintiff's lap. ECF No. 10-2 at 40 (investigator's interview notes, indicating that he asked Jane Roe, "Information received indicated that you were rubbing your butt on the respondent's penis while sitting on him in the back seat of the car. Can you respond to this information?" and that Jane Roe responded, "I was not.").

The record also suggests that the Plaintiff's proposed witnesses were prepared to testify that Jane Roe and her female friend invited the Plaintiff and one other male friend to their dorm, which would contradict Jane Roe's written statement, which states, "one of [Plaintiff's] visiting friends and himself suggested that they come back to my friends and I dorm . . . . Although my friend and I agreed to them coming over since I knew she liked [Plaintiff's] friend, I made it a point that we can all, as a group, watch tv in my room as a way to infer that I had no intentions of doing anything sexual . . . ." ECF No. 10-2 at 3. In contrast, the Plaintiff's friend "JM" stated in his interview that "[Plaintiff] was going to go back to his room, but the ladies wanted me and [Plaintiff] to come back with them. They said 'let's chill, let's come over to our place.' . . . My friend [KW] stayed in the car because he did not have a date." ECF No. 10-2 at 35. In his written statement, "KW" similarly wrote, "[Plaintiff] got out [of the car]. Both girls in the backseat called out to him to pull him back into the car. They wanted him to come back to their place. . . .

I sure wasn't being invited back to their dorm. . . . I stayed in the car and wasn't invited in. When they left the car, the girls led [JM] and [Plaintiff] to their building. No one invited me to do anything." ECF No. 10-11 at 2.

Based on this evidence, the Plaintiff's proposed witnesses would have provided relevant testimony as to Jane Roe's credibility, but the hearing officers allowed testimony only from "JM," refusing to hear testimony from "FW," "KW," and two other witnesses proposed by the Plaintiff. "KW" was never even interviewed during the investigation, though the Plaintiff identified him as a potential witness during his interview. ECF No. 10-2 at 31. Under the factors identified in *Mathews v. Eldridge*, although there is a "risk of an erroneous deprivation" in any case involving a "he said/she said" dispute, that risk was heightened by the procedures used here. In such a dispute, evidence bearing on credibility is critical, and thus the "probable value" of allowing these witnesses to testify, as an additional procedural safeguard, was substantial. That value easily outweighed any burden on UCONN, since the witnesses were already present at the hearing and willing to testify.

In addition to denying the Plaintiff the opportunity to present four of his five witnesses, UCONN also never gave the Plaintiff an adequate opportunity to respond to or question Jane Roe or the other female witnesses interviewed during the investigation. Under UCONN's policy, the Plaintiff was provided with a copy of Jane Roe's statement and notes from interviews with Roe and two other female witnesses only after the investigation was complete and the investigator had prepared recommended findings. ECF No. 2-4 at 12–13; Doe Aff., ECF No. 2-3 ¶ 26. At the hearing, only Roe testified; the other two female witnesses did not attend. Doe Aff., ECF No. 2-3 ¶ 44. The Plaintiff, therefore, did not have the opportunity at any point in the process to propose any questions for the two female witnesses, *Id.* ¶ 44, 48, let alone to cross-

examine them. But the investigator and the hearing officers relied on the interviews of those witnesses in making their determinations. *See* ECF No. 10-7 at 8, 10 (investigator quoting statements from female witnesses, "S3" and "S4" in analyzing the disputed facts of the incident and concluding "there is a preponderance of the evidence that [Plaintiff] engaged in non-consensual sexual contact"). And while the Plaintiff was allowed to propose some questions for the hearing officers to ask Jane Roe, the hearing officers did not ask every question the Plaintiff proposed, according to representations by Plaintiff's counsel during the January 23, 2020 argument. *See also id.* ¶ 49 (The Plaintiff asked for a copy of any statement Roe submitted in April 2019, but UCONN did not provide it, and the hearing officers accepted Roe's testimony that it was the "same" as her later statement without further questioning.).

In analyzing the requirements of due process in the context of university disciplinary proceedings, courts differ on the question of whether the accused has a right to cross-examine witnesses in the traditional manner. *Compare Doe v. Baum*, 903 F.3d 575, 578 (6th Cir. 2018) ("[I]f a student is accused of misconduct, the university must hold some sort of hearing before imposing a sanction as serious as expulsion or suspension, and [] when the university's determination turns on the credibility of the accuser, the accused, or witnesses, that hearing must include an opportunity for cross-examination.") *with E.K. v. Stamford Bd. of Educ.*, 557 F. Supp. 2d 272, 276 (D. Conn. 2008) (finding that "the weight of authority has concluded that due process does not afford high school students the right to confront and cross-examine student witnesses or accusers at expulsion hearings," albeit relying in part on earlier Sixth Circuit authority apparently somewhat inconsistent with *Baum*). Here, however, the Plaintiff was denied even the right to *respond* to the accusations against him in a meaningful way, because he had no opportunity to question or confront two of Roe's witnesses on whose statements the hearing

9

officers chose to rely. Given UCONN's reliance on this testimony and given the importance of credibility evidence to this factual dispute, denying the Plaintiff the opportunity to respond fully to Jane Roe and her witnesses heightened the risk of erroneous deprivation. *See Doe v. Univ. of Cincinnati*, 872 F.3d 393, 400 (6th Cir. 2017) ("Review under *Mathews* asks only whether John Doe had an opportunity to respond, explain, and defend."); *id.* at 406 (noting that "witness questioning may be particularly relevant to disciplinary cases involving claims of alleged sexual assault or harassment" since "[c]redibility disputes" are common).

This case involves a severe sanction, a "he said/she said" dispute hinging on the credibility of Roe and the Plaintiff, and important procedural shortcomings in exploring the critical issue of credibility. Under these circumstances, the Plaintiff has shown a clear likelihood of success on the merits of his due process claim. *See Wasson v. Trowbridge*, 382 F.2d 807, 812 (2d Cir. 1967) ("We conclude, therefore, that due process only requires for the dismissal of a Cadet from the Merchant Marine Academy that he be given a fair hearing at which he is apprised of the charges against him and permitted a defense. . . . [T]he rudiments of a fair hearing in broad outline are plain. The Cadet must be apprised of the specific charges against him. He must be given an adequate opportunity to present his defense both from the point of view of time and *the use of witnesses and other evidence*." (emphasis added)); *Purdue Univ.*, 928 F.3d at 664 (plaintiff adequately alleged a violation of due process where, "in a case that boiled down to a 'he said/she said,'" the university's "Advisory Committee[] fail[ed] to make any attempt to examine [complainant] Jane's credibility" even though plaintiff "identified specific impeachment evidence," and noting that the "failure to even question Jane or John's roommate to prove whether this evidence was reason to disbelieve Jane was fundamentally unfair to John").

### C.  Balance of Equities and Public Interest

The balance of equities in this case favors a TRO. As discussed above, the Plaintiff faces a severe sanction and a cloud over his future, and the semester has already begun without him. If he is not permitted to enroll and attend classes while he litigates his claims against UCONN, he will not graduate on time and will have a gap on his résumé and transcript to explain to any future schools or employers, even if he ultimately prevails in this case. Money damages cannot compensate him for these harms, in part because they would be virtually impossible to determine.  How does one know why one's job or school application is rejected?

While UCONN certainly has an interest in designing and implementing its own disciplinary proceedings, the harm a TRO would inflict on UCONN is slight. It will suffer no harm if the Plaintiff enrolls and begins to take classes this Spring; UCONN's general counsel confirmed on the January 23, 2020 telephonic status conference that UCONN would not incur any monetary harm from the Plaintiff's enrollment in the Spring semester. The Plaintiff's enrollment may cause some emotional harm to Jane Roe, for example, if she encounters the Plaintiff on campus. However, the Plaintiff avers that there was "no incident or conflict between" him and Roe between April 2019 and December 2019, even though they sometimes crossed paths at their jobs for the same campus employer. Doe Aff., ECF No. 2-3 ¶ 50. Further, nothing in the record before the Court suggests that  UCONN is concerned that the Plaintiff's presence on campus might inflict particular harm on Roe: it took no action in response to Roe's initial April 2019 allegation, and it did not institute any interim measures—such as a no-contact order—after she renewed her allegations in September 2019. *Id.* Therefore, because the suspension's harm to the Plaintiff outweighs any harm to UConn or anyone else, the balance of equities favors the issuance of a TRO that allows him to enroll and take classes while the parties

11

litigate his motion for a preliminary injunction. An evidentiary hearing on that motion has already been scheduled for February 11, 2020.

Finally, the public interest favors a TRO to protect the Plaintiff's constitutional right to due process while the parties litigate the preliminary injunction motion. There is a public interest in avoiding violations of constitutional rights. *See, e.g., Floyd v. City of New York*, 959 F. Supp.2d 668, 673 (S.D.N.Y. 2013). While there is also a public interest in enforcement of university disciplinary policies, allowing the Plaintiff to enroll in school while the Court adjudicates his motion for a preliminary injunction does not unreasonably interfere with that interest. Should the Plaintiff fail to introduce sufficient evidence to support his claims at the upcoming preliminary injunction hearing, the Court will deny his motion and there will have been but a brief interruption in the enforcement of UCONN's disciplinary regime to ensure that it complied with due process principles.

## III.   CONCLUSION

Accordingly, it is HEREBY ORDERED that the individual defendants, their officers, agents, servants, employees, attorneys, and any other persons who are in active concert or participation with them are ENJOINED from enforcing the Plaintiff's suspension stemming from the alleged sexual assault. Provided there are no independent reasons to prevent the Plaintiff from enrolling in the Spring semester (such as nonpayment), the defendants SHALL ALLOW the Plaintiff to enroll, to register for classes, to seek available University housing, and to exercise all the rights of a UCONN student. This TRO will remain in effect until the Court rules on the Plaintiff's motion for a preliminary injunction, following the hearing scheduled for February 11, 2020.

Because the record before the Court includes no suggestion that the Defendants will incur monetary harm as a result of this order, the Court finds that no security is warranted. Fed. R. Civ. P. 65(c).

The Plaintiff shall serve a copy of this order, his Amended Complaint, and his motion for a TRO and supporting papers on the new individual defendants and shall file proof of service on the docket by 5:00 PM on January 24, 2020, unless Attorney Lenehan communicates a willingness to accept service on behalf of all defendants.

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated:        Hartford, Connecticut
              January 23, 2020 at 7:30 p.m.